[No. 29055-7-III.   Division Three.   February 2, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. LEWIS ADAM LAWRENCE, *Appellant*.

*Marie J. Trombley*; and *Thomas C. Sand* (of *Miller Nash LLP*), for appellant.

*Denis P. Tracy, Prosecuting Attorney*, for respondent.

¶1 KORSMO, J. — The primary issues in this appeal from three convictions for attempted first degree murder involve the trial court's rulings finding Lewis Lawrence competent to stand trial and allowing him to represent himself. Finding no error, we affirm.

## BACKGROUND

¶2 The facts underlying the criminal charge can be briefly stated. In March 2009, Mr. Lawrence had a disagreement with his friends, Michael and Yuteson Fuaau, over his

contribution to the dinner they were planning together, and departed. He returned around midnight in the company of another friend. He got out of his car and approached the Fuaaus' apartment armed with a 12-gauge shotgun.

¶3 When Michael Fuaau opened the door, Lawrence shot him in the face and head with birdshot. He fired two more shots into the apartment where Yuteson Fuaau and Ahferom Zerai were located. They escaped injury.

¶4 Idaho police arrested Mr. Lawrence shortly thereafter. He told them he wanted to kill the Fuaau brothers, who had been his friends, because he believed they were part of a Samoan gang that had threatened his family. Officers later determined that there had been no threat and that Mr. Lawrence was not involved in gang and drug trafficking as he had claimed.

¶5 The prosecutor immediately filed three counts of attempted first degree murder with accompanying firearm allegations. A lengthy sojourn through the mental health system ensued. Defense counsel obtained an order directing a competency evaluation on March 27, 2009. The sanity commission recommended that Mr. Lawrence be committed to Eastern State Hospital (ESH) for competency restoration.

¶6 A formal hearing was held May 15. Dr. William Grant testified that Mr. Lawrence was mentally ill and diagnosed him with "psychosis not otherwise specified." The trial court, the Honorable David Frazier, found Mr. Lawrence not competent to stand trial and committed him to ESH for competency restoration. The court directed use of anti-psychotic or psychotropic medications as needed.

¶7 ESH discharged Mr. Lawrence on July 22; the court considered the ESH report on August 20. Mr. Lawrence had not been cooperative and the report found his competence a "close call." The evaluating doctors found that he had unrealistic thinking and bad judgment. They determined that he suffered from antisocial personality disorder and

narcissistic personality features rather than a mental disease or defect. The trial court ruled that Mr. Lawrence was competent to stand trial.

¶8 When the court announced that Mr. Lawrence was competent, Mr. Lawrence promptly asked the court whether his "UCC-1 form" had been filed. This led to an exchange with the court that raised concerns, but the court still signed the order finding Mr. Lawrence competent.

¶9 Mr. Lawrence requested permission to represent himself on September 28. Counsel for both parties questioned his competence and the trial court again appointed a sanity commission. Dr. Greg Wilson, who specializes in evaluating developmental disabilities, was added to the commission as an independent evaluator for the defense. Defense counsel advised the court that Mr. Lawrence's family had concerns that he might have fetal alcohol syndrome (FAS). Report of Proceedings (RP) (Sept. 28, 2009) at 112.

¶10 Over the next five weeks, Mr. Lawrence sent letters to the court, the prosecutor's office, and the clerk of court. He accused the judge and prosecutor of being biased against him and stated that the judge was falsely accusing him because "the judge did not see him pull the trigger." At a competency review on November 6, defense counsel advised the court that his client still desired to represent himself. The court ruled that Mr. Lawrence was not then competent and could not represent himself. ESH doctors reported that Mr. Lawrence refused to meet with them. Dr. Wilson, however, had been able to meet with Mr. Lawrence.

¶11 Dr. Wilson testified at a competency hearing November 12. Mr. Lawrence raised his voice and used profanity before voluntarily leaving the courtroom. Dr. Wilson diagnosed Mr. Lawrence as having bipolar illness with psychotic features. He was of the opinion that Mr. Lawrence understood the rudimentary components of the judicial process and could be found guilty. Dr. Wilson also opined that due to his illness, Mr. Lawrence was unable to understand the need for representation by counsel. Dr. Wilson did not offer testimony about

FAS or other developmental disabilities. The court determined that Mr. Lawrence was not competent and again committed him to ESH for competency restoration.

¶12 The trial court found Mr. Lawrence competent at a hearing on February 5, 2010, following a report from ESH. Although expressing his own concerns about the defendant's condition, Judge Frazier stated that he would "defer to the professionals" who spent greater time evaluating the defendant. RP (Feb. 5, 2010) at 182. Mr. Lawrence renewed his motion to proceed pro se on February 17. Despite continuing reservations about Mr. Lawrence's mental health, the court granted the request after conducting a colloquy on the record. Five days later, Mr. Lawrence changed his mind and requested counsel. The trial court reappointed defense counsel.

¶13 On March 26, one week before the scheduled trial, Mr. Lawrence learned that his statements to the police would be admitted and that the court had denied his motion to suppress the evidence found in his car. He requested that the court appoint new counsel for him at public expense. The motion was denied and a heated exchange with the trial court ensued. The trial court also denied a renewed request to proceed pro se, with the court noting that Mr. Lawrence did not have the ability to properly represent himself.

¶14 Three days later Mr. Lawrence, with the assistance of counsel, filed an affidavit of prejudice against Judge Frazier. Judge Frazier honored the affidavit. Judge William Acey then was assigned the case.

¶15 Mr. Lawrence again sought to represent himself. After engaging in the standard colloquy, Judge Acey accepted the waiver of counsel. The case proceeded to trial with Mr. Lawrence representing himself. He testified as the sole defense witness and told jurors that at the time of the shooting he had been on the other side of town robbing six men of their black diamonds. He refused to disclose where

the diamonds were hidden. The Fuaau brothers and Mr. Lawrence's passenger all identified him as the shooter. Mr. Lawrence's admissions to Idaho authorities were also put before the jury.

¶16 No lesser included offenses were sought by either party. The jury concluded that Mr. Lawrence was guilty as charged. He continued to represent himself at sentencing.

¶17 The State sought a mid-range sentence of 67.5 years. Mr. Lawrence reiterated that he had not committed the crimes, because if he had, the victims would have been dead. He also referred to them:

> [M]y revenge in my heart will come and strike. And when it comes time when I do become released, Michael, you may think in your heart that I did this crime to you, but I did not. But my vengeance will come up on you and your family . . . . I will get my chance. And then all you can put the finger at me when it comes time to. . . . And that's the truth. . . . I promise to get my justice against Michael and Yutie Fuaau. I'm going to do it in broad daylight when it comes, and then I'm going to turn myself in.

RP (Apr. 21, 2010) at 1634-1637. Mr. Lawrence also requested that he be sentenced above the standard range to a life sentence. RP (Apr. 21, 2010) at 1618, 1619.

¶18 Amidst ongoing interruption from Mr. Lawrence, the trial court attempted to impose sentence. The judge initially noted that "because they are serious violent offenses, and different victims, I don't have any choice but to run Counts 1, 2, and 3 consecutive; I'm required by law to run them consecutive. My only question is, do I give you low end of the range, high end of the range, or mid-range." RP (Apr. 21, 2010) at 1644. While initially disposed to impose the requested mid-range sentence, Judge Acey changed his mind after listening to Mr. Lawrence: "But I am convinced that you are still so angry about this, and hold so much vile hatred in your heart—that I have no choice—have no choice but to sentence you to the maximum under the law. . . . I

cannot trust you out on the streets, sir. So I'm giving you what I hope will be a life sentence to you. Because that's the only thing safe for society." RP (Apr. 21, 2010) at 1647. The court imposed consecutive high-end 300 month terms.

¶19 The case was timely appealed. Appointed counsel represents Mr. Lawrence in this court.

## ANALYSIS

¶20 This appeal raises five issues, which we will address in the order they arose before the trial court. Mr. Lawrence attacks the trial court's competency determination on multiple grounds and also takes issue with the decision to permit him to represent himself, the failure to instruct on lesser degree offenses, the special verdict form, and the sentencing decision.

### Competency Determination

¶21 Mr. Lawrence takes issue with Judge Frazier's ultimate ruling that he was competent to stand trial, arguing that the evaluation from ESH was flawed by its failure to discuss FAS and that the trial court also erred in finding him competent. The record does not reveal any errors in the evaluation process. There also is no basis for finding that the court abused its discretion.

¶22 "Whenever . . . there is reason to doubt [a defendant's] competency, the court on its own motion or on the motion of any party shall" order an evaluation. RCW 10.77.060(1)(a). A person is competent to stand trial if he understands the nature of the proceedings against him and can assist in his own defense. *State v. Hahn*, 106 Wn.2d 885, 895, 726 P.2d 25 (1986).

¶23 We review a trial court's competency determination for abuse of discretion. *State v. Ortiz*, 104 Wn.2d 479, 482, 706 P.2d 1069 (1985), *cert. denied*, 476 U.S. 1144 (1986). Discretion is abused when it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v.*

*Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). Discretion also is abused when a court uses an incorrect legal standard in making a discretionary decision. *State v. Rundquist*, 79 Wn. App. 786, 793, 905 P.2d 922 (1995), *review denied*, 129 Wn.2d 1003 (1996).

¶24 When the court refers a defendant for a competency evaluation, at least two experts shall be appointed to conduct the examination and report to the court. RCW 10.77-.060(1)(a). In long-standing common parlance, this evaluation committee is known as a "sanity commission."[1] *E.g.*, *State v. Williams*, 34 Wn.2d 367, 371, 209 P.2d 331 (1949). By statute, the court may direct that the defendant's own "qualified expert or professional person" be allowed to witness the evaluation and report to the court. RCW 10.77.060(2). Washington also requires that "a developmental disabilities professional" shall be included on the commission "if the court is advised by any party that the defendant may be developmentally disabled." RCW 10.77.060(1)(a).

¶25 Mr. Lawrence begins his argument with this last requirement. Dr. Wilson, who was appointed to the commission as the defense expert, was also a developmental disabilities professional. He also was the one expert from the commission to testify at the November 12 competency hearing. Neither the commission's report nor Dr. Wilson's testimony discussed FAS or addressed whether Mr. Lawrence had any developmental disabilities. Because of these facts, Mr. Lawrence argues that the trial court erred in finding him competent since the experts (and the court) never addressed his developmental disability. There are at least two problems with this argument.

¶26 The first is factual. While Mr. Lawrence argues that he was previously diagnosed with FAS, nothing in the

---

[1] The statutory evaluation panel was referred to as a "commission to determine the sanity or insanity" of the defendants in *State ex rel. Mackintosh v. Superior Court of King County*, 45 Wash. 248, 252, 88 P. 207 (1907) (discussing Bal. Code § 2660).

record supports that claim. The only evidence before the court was that family members believed he may have suffered from the condition, so an expert in the field was added to the sanity commission. When the expert reported back to the court, no mention was made of the condition. Similarly, the written report from the sanity commission did not touch on the topic. On this record, there is simply no basis for believing that Mr. Lawrence has FAS.

¶27 The second problem with the argument is legal. He cites no authority requiring the sanity commission to address the developmental disabilities claim. The statute directs that the sanity commission address the issue of developmental disabilities only when it finds the defendant is not competent. RCW 10.77.084(1) states:

> (b) A defendant found incompetent shall be evaluated at the direction of the secretary and a determination made whether the defendant is an individual with a developmental disability. Such evaluation and determination shall be accomplished as soon as possible following the court's placement of the defendant in the custody of the secretary.
>
> (i) When appropriate, and subject to available funds, if the defendant is determined to be an individual with a developmental disability, he or she may be placed in a program specifically reserved for the treatment and training of persons with developmental disabilities.

The apparent purpose of this requirement is to help direct people with developmental disabilities into appropriate programs for restoring competency.

¶28 The commission did not find Mr. Lawrence to be incompetent, so there was no requirement that he be evaluated for developmental disabilities as part of a treatment regime. There also was no requirement in RCW 10.77.060 that the sanity commission otherwise address the issue of developmental disabilities. Rather, since there was an allegation that such disabilities existed, the committee was required to have an expert in the field. This committee did.

¶29 It is understandable that the commission's report did not address the topic. In addition to there being no mandate to do so under these factual circumstances, the report was directed at answering the question of competency—did Mr. Lawrence understand the proceedings against him and was he able to assist counsel in his defense. The existence of a developmental disability does not answer either of those questions. A disability may explain an underlying condition that renders a defendant incompetent, and the disability most certainly will need to shape a treatment program, but the existence of a developmental disability does not itself answer the question of whether a person is unable to appreciate the proceedings against him or to assist counsel.

¶30 The argument that the competency determination was flawed because the court did not consider the question of FAS or developmental disabilities is without foundation in fact or law. The trial court was not required to consider the issue in the absence of any party presenting evidence and argument on the relevancy of FAS to Mr. Lawrence's ability to understand his pending legal situation.

¶31 The remaining question is whether the trial court erred in finding him competent to stand trial under the circumstances of this case. Mr. Lawrence argues that Judge Frazier deferred to the experts instead of making his own determination. We disagree. In context, the judge deferred to the evidence and opinion of the professionals rather than rely upon his own concerns:

> But the reason that I made the decision, on two occasions, to send Mr. Lawrence to Eastern State Hospital for an evaluation is because I have no training in psychology, very little training in psychology, none in psychiatry; I do not have the professional expertise to make a diagnosis. I certainly, I think, have the ability to be concerned, be suspicious, that someone is not able to represent themselves or to assist counsel in their defense, or to understand the proceedings. But that's why we have professionals, and I feel I must defer to the professionals that have

spent a lot of time conducting testing and examination of Mr. Lawrence.

RP (Feb. 5, 2010) at 182-183.

¶32 Far from abdicating his responsibility, Judge Frazier dutifully applied the evidence presented to the legal question before him—did Mr. Lawrence understand the nature of the proceedings and was he able to assist his counsel. The compelling evidence was that of the professionals who understood mental health issues and had evaluated Mr. Lawrence. "Deferring" to the experts simply meant acknowledging that they were in a better position than the trial judge to understand Mr. Lawrence's situation.

¶33 The expert opinion that Mr. Lawrence was competent provided a tenable basis for the trial court's legal ruling. There was no abuse of discretion.

*Self-Representation*

¶34 Mr. Lawrence strenuously argues that the trial court erred in permitting self-representation at trial, arguing that his mental condition should have precluded the trial court from accepting his waiver of the right to counsel. We disagree. Trial judges have permissive authority to deny self-representation to those suffering from mental illness. It is not error when a trial judge, as here, allows a mentally ill defendant to waive the right to counsel.

¶35 The Sixth Amendment right to counsel carries with it the implicit right to self-representation. *Faretta v. California*, 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975). Article I, section 22 of the Washington constitution creates an explicit right to self-representation. *State v. Madsen*, 168 Wn.2d 496, 503, 229 P.3d 714 (2010). In order to exercise the right to self-representation, the criminal defendant must knowingly and intelligently waive the right to counsel; that waiver should include advice about the dangers and disadvantages of self-representation. *Faretta*, 422 U.S. at 835. A

thorough colloquy on the record is the preferred method of ensuring an intelligent waiver of the right to counsel. *City of Bellevue v. Acrey*, 103 Wn.2d 203, 211, 691 P.2d 957 (1984).

¶36 While courts must carefully consider the waiver of the right to counsel, an improper rejection of the right to self-representation requires reversal. *Madsen*, 168 Wn.2d at 503. Courts should engage in a presumption against waiver of counsel. *Id*. at 504. However,

> [t]his presumption does not give a court carte blanche to deny a motion to proceed pro se. The grounds that allow a court to deny a defendant the right to self-representation are limited to a finding that the defendant's request is equivocal, untimely, involuntary, or made without a general understanding of the consequences. Such a finding must be based on some identifiable fact; the presumption in [*In re Det. of* ]*Turay*[, 139 Wn.2d 379, 986 P.2d 790 (1999)] does not go so far as to eliminate the need for any basis for denying a motion for pro se status. Were it otherwise, the presumption could make the right itself illusory.

*Id*. at 504-505. The defendant's "skill and judgment" is not a basis for rejecting a request for self-representation. *Hahn*, 106 Wn.2d at 890 n.2.

¶37 The existence of two competing and contradictory rights often leaves trial judges in a very difficult position. When the would-be pro se defendant also suffers from mental illness issues, the trial court is presented an even more difficult problem. The United States Supreme Court subsequently faced that problem in *Indiana v. Edwards*, 554 U.S. 164, 171 L. Ed. 2d 345, 128 S. Ct. 2379 (2008). There the trial court had denied self-representation to the defendant, who was competent to stand trial but whose mental illness prevented him from conducting the trial proceedings by himself. The Supreme Court agreed, noting that *Faretta* did not require allowing a mentally ill defendant to undertake representation when he "lacks the mental capacity to conduct his defense without the assistance of

counsel." 554 U.S. at 175-176. Instead, the court concluded that a state could deny self-representation to a defendant who was competent to stand trial but was not "competent" to represent himself. *Id.* at 174, 178.

¶38 *Edwards* referred to defendants who are competent to stand trial but whose mental illness raises questions about "mental fitness for another legal purpose" as falling in a "gray area." *Id.* at 172. The court had previously addressed another "gray area" defendant in *Godinez v. Moran*, 509 U.S. 389, 125 L. Ed. 2d 321, 113 S. Ct. 2680 (1993). There the question had been whether a higher standard of mental functioning was required to plead guilty or to waive counsel than to stand trial. *Id.* at 391. The court concluded that there was not a higher standard and permitted the defendant to waive counsel and plead guilty. *Id.* *Edwards* concluded that although *Godinez* permitted a state to allow self-representation to a "gray area" defendant, it did not require the state to do so. 554 U.S. at 173-174.

¶39 It was against this backdrop that the Washington Supreme Court addressed the *Edwards* problem in *In re Personal Restraint of Rhome*, 172 Wn.2d 654, 260 P.3d 874 (2011). There a defendant with a history of mental illness who was found competent to stand trial had been permitted to waive his right to counsel and represent himself in a murder trial. The court's colloquy did not directly address the defendant's mental health issues. He was convicted and later filed a personal restraint petition, arguing that Washington law required a court to consider a competent defendant's mental illness before permitting a waiver of counsel. *Id.* at 657, 664. He based his argument in large part on a pre-*Faretta* case, *State v. Kolocotronis*, 73 Wn.2d 92, 436 P.2d 774 (1968).

¶40 The *Rhome* court turned to Washington precedent and analyzed both *Kolocotronis* and *Hahn*. In *Kolocotronis*, the court had considered a mentally ill defendant's medical history and only partially allowed him to represent himself.

Counsel also took part in the trial proceedings and had successfully submitted an insanity defense over the defendant's objections. 73 Wn.2d at 93-96. In *Hahn,* the defendant's mental illness history was not a part of the colloquy when the trial court permitted the defendant to represent himself. 106 Wn.2d at 886-888, 896 n.9. The *Rhome* court summed up *Edwards, Kolocotronis,* and *Hahn* this way:

> Read together, these three cases stand for the proposition that a defendant's mental health status is but one factor a trial court may consider in determining whether a defendant has knowingly and intelligently waived his right to counsel, but they do not require us to find that an independent determination of competency for self-representation is a constitutional mandate.

172 Wn.2d at 665.

¶41 *Rhome* acknowledged that it might be possible to require "a more stringent waiver of counsel for a defendant whose competency is questioned." *Id.* However, it declined to do so in Rhome's case because of the limitations on declaring new rules of criminal procedure in a collateral proceeding. *Id.* at 665-666 (citing *Teague v. Lane,* 489 U.S. 288, 103 L. Ed. 2d 334, 109 S. Ct. 1060 (1989)).

¶42 Mr. Lawrence now asks us to answer the question the *Rhome* court had to decline to address and hold that Washington law requires trial courts to consider a mentally ill defendant's ability to represent himself at trial before accepting a waiver of counsel. This admittedly goes beyond the rule of *Edwards* and *Kolocotronis* by requiring trial judges to do what those cases merely permit a judge to do. For several reasons, we decline to create a new requirement for trial courts.

¶43 First, the requested rule is inconsistent with *Hahn.* There the court found a valid waiver of counsel despite the trial court's failure to address the defendant's mental illness during the colloquy. As recognized in *Rhome,* the creation of a new rule would require the court to at least

"reconsider" *Hahn*. 172 Wn.2d at 664. This court is not in a position to overturn a decision of the Washington Supreme Court. *E.g., State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984). If *Hahn* is to be changed, that court must do so. This court lacks that authority. *Id*.

¶44 Second, the record is less than clear, but it appears that the respective trial judges had already considered Mr. Lawrence's mental capacity when analyzing his requests to represent himself. Judge Frazier clearly did so on both February 17 when he granted the request and on March 26 when he denied a renewed request for self-representation. It is less clear that Judge Acey considered Mr. Lawrence's waiver in light of his mental illness. Judge Acey showed some familiarity with the court file in noting that Judge Frazier had once before granted Mr. Lawrence's request to represent himself, but the record of the hearing does not suggest whether or not Judge Acey was familiar with the mental competency issues in the case. Nothing in Mr. Lawrence's behavior before Judge Acey was improper or otherwise suggested he was not competent to represent himself.

¶45 Mr. Lawrence argues now that the court file put Judge Acey on notice that he had mental health issues that should have been addressed during the colloquy. This argument tends to undercut his position. If Judge Acey was totally familiar with the record, then the mental health issues necessarily informed the waiver decision even if the court did not articulate them during the colloquy. If he was not familiar with the record, then there was no basis for believing there was any need for special consideration of mental health issues in assessing the waiver.

¶46 On balance, the record does not assist Mr. Lawrence's argument. It does, however, point to an issue that would tend to recur in this situation. A defendant seeking to represent himself has no incentive to increase his burden by pointing out to the court that he has mental health issues. Neither defense counsel (if there is one) nor the

prosecutor are true adversary parties to the waiver question since it is not their job to interfere with the defendant's exercise of the right to represent himself. They likewise lack incentive to make a record of mental health concerns that are unknown to the trial judge.

¶47 Finally, applying Mr. Lawrence's proposed rule would be difficult in practice, particularly for reviewing courts. Trial judges already have discretionary authority under *Edwards* and *Kolocotronis* to consider known mental health problems when addressing a waiver of counsel. While it certainly would be possible to require trial courts to address mental health issues as part of a colloquy, knowing when the court was required to do so would be difficult. Would there have to have been a competency hearing as (repeatedly) happened here? What if there had been competency or sanity issues in a previous case involving the defendant? Would inquiry be required even if there were no objective reasons for raising the issue in the present case? The situation of an individual with significant history of mental illness, unknown to the court and counsel, who does not manifest difficulties in court, would present another problem. The history may call for an inquiry, but the behavior does not. Should the trial court be faulted for failing to do something it had no reason to believe it needed to do?

¶48 Review of waiver decisions also would be difficult. Appellate courts already review these rulings for abuse of discretion. *Rhome*, 172 Wn.2d at 667. Typically, the failure to comply with a required obligation constitutes an abuse of discretion. *E.g.*, *State v. Rivers*, 129 Wn.2d 697, 706, 921 P.2d 495 (1996). Thus, assuming a standard can be agreed upon that would trigger the trial court's inquiry, a reviewing court could assess whether that duty was undertaken. However, the substance of the decision would be exceptionally difficult to review. Assessment of a defendant's ability to represent himself from the written pages of a transcript would be impossible except for the situation where the

defendant could not communicate at all. It would be equally difficult to assess a trial judge's determination that a defendant was or was not able to represent himself due to mental illness. Just as we defer to credibility decisions made by the trier-of-fact who saw the witnesses in the courtroom and decided who to believe, we would have to defer to the similar choices made by the trial judge considering the evidence of the defendant's capacity to perform in the courtroom. This competency determination would be essentially unreviewable because there would always be a tenable basis for the ruling whenever the judge stated, "I believe you are/are not able to do the job."

¶49 In practice, Mr. Lawrence's suggested standard would be hard to apply and would not be subject to meaningful review. For that reason, also, we find his argument unpersuasive.

¶50 Trial judges face exceedingly difficult choices when deciding whether to allow a defendant to waive the right to counsel in order to assert the right to self-representation. They already have discretionary authority to reject a waiver when mental illness prevents a defendant from having the ability to present his own case at trial. Mandating the use of that discretionary authority in some difficult-to-define subset of these types of cases will only limit trial court discretion at a time when it is most needed and will not provide for any meaningful review.

¶51 Having rejected Mr. Lawrence's standard, we still must consider whether Judge Acey abused his discretion in granting the request for self-representation. The record reveals there were tenable bases for granting the motion. Mr. Lawrence presented well and did not display any untoward behavior in the courtroom.[2] He engaged in an extended colloquy with Judge Acey and essentially explained he wanted to be able to present his own theory of

---

[2] His behavior remained good until sentencing. Although irrelevant to our discussion, Mr. Lawrence was able to represent himself at trial and his illness does not appear to have hampered the presentation of his unusual defense to the jury.

the case rather than rely upon counsel, who he did not believe was working in his best interests. His explanation is one rather commonly seen among those who desire to represent themselves. In short, there was nothing out of the ordinary that would have permitted Judge Acey to veto Mr. Lawrence's decision to represent himself.

¶52 Mental illness is often a fluid situation with the condition of the afflicted changing repeatedly over time. *Edwards*, 554 U.S. at 175. That fluidity was demonstrated in this case. Judge Frazier had twice found Mr. Lawrence not competent to stand trial, and twice found that he was. Judge Frazier once found that Mr. Lawrence was capable of representing himself without counsel, and one time determined that he was not. Just as none of these decisions settled the issue once and for all, none of these prior rulings establish that Judge Acey erred in permitting self-representation in April 2010. Mr. Lawrence was competent to represent himself at the time Judge Acey inquired of him and accepted his waiver of counsel. Whatever his mental condition earlier, the record supports the court's ruling that he was able to represent himself in April 2010.

¶53 Mr. Lawrence has not established that the trial court abused its discretion in granting his request to represent himself at trial.

¶54 Affirmed.

¶55 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

KULIK, C.J., and SWEENEY, J., concur.

Review denied at 174 Wn.2d 1009 (2012).