IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 36709-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALAN RAY REUKAUF, | ) | UNPUBLISHED OPINION |
| A/K/A ALLEN REUKAUF, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Alan Reukauf appeals his conviction for failure to register as a sex offender, challenging the sufficiency of the evidence, the court's denial of his request to represent himself, his offender score, and a community custody condition requiring him to pay supervision costs. While the State does not concede the challenge to the community custody condition, it does not object if we remand with directions to strike it, which we do. Finding no error or abuse of discretion, and that Mr. Reukauf's pro se statement of additional grounds raises no meritorious issues, we otherwise affirm.

FACTS AND PROCEDURAL BACKGROUND

As a result of Alan Reukauf's 1983 conviction in California for forcible rape, Washington counties have required him to register as a sex offender. He was convicted in 2010 for failure to register as a sex offender in Skamania County, and in 2011 for failure to register in Benton County. In September 2017, Mr. Reukauf registered with Franklin County. As a transient, he was required to check in weekly. When he failed to appear for his weekly check-ins between August 15 and September 20, 2018, he was charged with failure to register as a sex offender (third or subsequent offense).

At the first reported court proceeding following his arrest, Mr. Reukauf's court-appointed lawyer, with the prosecutor's support, asked the court to order an evaluation of Mr. Reukauf's competency. The short hearing at which the request was granted was dominated by Mr. Reukauf: he complained about his lawyer, whom he wanted fired (contending "he's working with the prosecution"), he complained that a prior competency evaluation had "delayed my trial for . . . nothing" since he was found competent (interjecting, "Coo coo. Coo coo. I'm crazy"), and he directed argumentative statements at the lawyers (saying, "You're worthless. So is this guy."). Report of Proceedings (RP) (Jan. 29, 2019) at 5-8.

Two weeks later, Jonathan M. Ryan, PsyD, submitted the results of his evaluation of Mr. Reukauf to the trial court. He explained that he had been unable to complete an

2

interview of Mr. Reukauf at the Franklin County Jail because about 45 minutes into the interview, Mr. Reukauf became angry when Dr. Ryan was not receptive to Mr. Reukauf's insistence that the doctor "use the '. . .art of deception' to convince the court to send him to a secure mental health facility."  Clerk's Papers (CP) at 34.  Dr. Ryan reported that Mr. Reukauf

> became highly agitated and stated, "So you are one of them.  How much do they pay you?  Fuck you, I am done."  He then stood up, picked up a chair, and threw it at the window.  After throwing a second chair, custody staff entered the room and restrained the defendant.

CP at 34-35.

Dr. Ryan nonetheless formulated an opinion based on the aborted interview, criminal, correctional, and counseling records, and two competency evaluations prepared by others in August 2017 and April 2018.  He quoted from the prior evaluations, both of which discussed Mr. Reukauf's belief that he was the target of a "Cabal."  Dr. Ryan's reproduction of portions of the prior evaluations included the following clinical observation of Dr. Lisa VanDerley:

> "[H]e did endorse a delusional belief system that he referred to as the 'Cabal.'  When asked to define this he said, 'It's a secret group of plotters, conspirators that have been out to get me for some time.'  Mr. Reukauf expressed that he believes the Cabal is made up of police officers and government officials.  He stated they have had a vendetta against him since 2002."

CP at 29-30 (quoting Competency Evaluation by Lisa VanDerley, PsyD, Aug. 7, 2017).

Dr. Ryan concluded,

> Mr. Reukauf may have a mental illness consisting of symptoms of depression and anxiety and a personality disorder. However, his symptoms of mental illness do not pose a barrier to competency at this time. . . . Mr. Reukauf has the capacity to understand the nature of the proceedings against him and to assist in his own defense, *should he elect to do so.* In my opinion, any refusal to assist his counsel i[s] likely due to his maladaptive personality traits and not the result of a mental disease or defect.

CP at 34. Dr. Ryan indicated the maladaptive behavior was related to a diagnosable personality disorder.[1]

Following receipt of Dr. Ryan's report, the parties stipulated that Mr. Reukauf was competent to stand trial. The trial court agreed and set trial for March 27, 2019.

At a pretrial conference two weeks later and 15 days before the scheduled trial, defense counsel reported that the plan had been to call ready for trial, but Mr. Reukauf was now seeking to represent himself. After hearing briefly from Mr. Reukauf, the trial court told him it would set a hearing for that afternoon so that it could "hear your—what you are facing and go through an extensive colloquy with you." RP (Mar. 12, 2019) at 4.

---

[1] "During the interview for the current evaluation, the defendant presented in a controlling, rather manipulative, and impulsive manner. The available information provided a very strong basis for concluding that he has developed maladaptive aspects to his personality and that these aspects of his personality are of sufficient magnitude to meet the criteria necessary for diagnosing a personality disorder." CP at 33.

At the afternoon hearing, Mr. Reukauf explained his desire to represent himself but had trouble sticking to the topics covered in the trial court's *Faretta*[2] inquiry. The court asked Mr. Reukauf if he understood his counsel was an experienced criminal defense attorney, but Mr. Reukauf replied, "No, no, no. That's just not going to happen. How about you let me explain why I tried to fire him." RP (Mar. 12, 2019) at 6.

The court asked about Mr. Reukauf's level of education and Mr. Reukauf said he had earned his general education degree, but he had not taken college classes. The court tried to inquire about Mr. Reukauf's familiarity with law, but did not receive helpful answers:

> THE COURT: Have you ever taken any type of law classes?
> MR. REUKAUF: I think it's irrelevant. I know how to speak the truth. I can speak English; you can speak English. I haven't studied law.
> THE COURT: Are you familiar with the rules of evidence?
> MR. REUKAUF: I know how to speak the truth.
> THE COURT: I will take that—
> MR. REUKAUF: And I am going to talk.
> THE COURT: I will take that as a no.
> MR. REUKAUF: And I am going to exercise my First Amendment rights.
> THE COURT: Are you familiar with—
> MR. REUKAUF: And I cannot get a fair trial with that man over there in the corner, that woman right there, the guy that just left her, named—Ryan Swinburnson sent me up for 22 months because I was charged for spitting in a cop's face, and I didn't do it. I did not spit in his face and I did 22 months in prison.
> THE COURT: Mr. Reukauf. Mr. Reukauf, again, we are talking about things that have no bearing on this court's decision of—
> MR. REUKAUF: I am just saying I can't get a fair trial in this court.
> THE COURT: Mr. Reukauf.

---

[2] *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975).

MR. REUKAUF:  And I am going to represent myself, if I have—no, I would love to have Perry Mason on my team.  Yeah, I would love to have the dream team on my team, yes.  I would love that.  But if it's a choice between me being my own lawyer and him, uh-uh.  It's me because it's— otherwise it's a total kangaroo court.

RP (Mar. 12, 2019) at 10-12.

The trial court asked Mr. Reukauf's lawyer whether he perceived a conflict, and the lawyer responded, "I believe myself and literally any other attorney who walks into this room is going to have the same conflict."  RP (Mar. 12, 2019) at 12.  When the court asked the lawyer to clarify, Mr. Reukauf interjected that his lawyer "is right," and "For a court appointed attorney, yeah, of course.  Yeah it's probably going to be like that."  *Id.*

With that, the trial court told Mr. Reukauf that based on the colloquy and the report from Dr. Ryan it was finding that he did not have the ability to represent himself.  It continued:

THE COURT:  The court finds, if I allow you to represent yourself, you would not be able to effectively do that in any way, shape, or sense of the nature of what that requires.  In addition, the court believes that based on the situation that you are in, that it would actually be materially harmful to the administration of justice of being able to get through the trial itself if you were allowed to represent yourself on this matter.
    Therefore, at this time the court is going to deny your request to discharge [defense counsel].  The court finds there is no conflict.  Certainly from what you are saying and what [defense counsel] has said, the court finds there is—
MR. REUKAUF:  There is a conflict—there is a conflict.
THE COURT:  —a difficulty in communicating—because you are creating that.
MR. REUKAUF:  No.  I am not creating it.  That man in the corner; that man, [identifying a prosecutor who was evidently observing the

6

proceeding].  You don't realize how he has—you don't realize—

THE COURT:  Mr. Reukauf, again, you are talking about things that have no bearing on the courts's [sic] decision.

MR. REUKAUF:  Oh, it does, man.  You don't understand.  See, that's why I got to talk.  That's why I have to talk.

THE COURT:  The fact that you are unable to listen to—

MR. REUKAUF:  This is my life.  I am 71 years old.  I don't need to go to prison.  You show me a victim.  Show me a victim.  Who did I hurt?  Who did I harm?  Some person could come forward.

THE COURT:  The court is denying your motion to represent yourself. The court finds you do not have the ability to do that.  The court finds—

MR. REUKAUF:  I hear you.  All right.  All right.  Yeah, okay.  I heard you.  Thanks a lot.

THE COURT:  —from your conduct that you are not willing to follow the court rules.  You are not willing to abide by even standard decorum of what a normal person would be—would abide by.

MR. REUKAUF:  Decorum.  Standard decorum.  That man is a murderer. That man is a murderer.

THE COURT:  So the court would find—

MR. REUKAUF:  He has got hit men.

THE COURT:  The court would find that the record speaks for itself as far as the comments that you have been making and the fact of—they have no basis as far as what you are asking for.

MR. REUKAUF:  I heard you.  You don't have to run it into the ground. You don't have to run it into the ground, sir.  I heard you.  Denied.

THE COURT:  Thank you, Mr. Reukauf.  That's all for today.

MR. REUKAUF:  Thank you.  Yeah.  Have a good day.  Yeah.  Save more lives.  It's fake.  You people are fake.  It's the money it's all about.  You need to be prosecuted under the RICO, Racketeer Influenced and Corrupt Organizations, because that's what you are about.

THE COURT:  Could you please take him out of the courtroom?

RP (Mar. 12, 2019) at 13-15.

The trial proceeded as scheduled.  On the morning of trial, outside the presence of

the jury, defense counsel expressed concern that he had tried unsuccessfully to provide

Mr. Reukauf with necessary advice on whether to testify. The trial court undertook to create the required record, interrupted by Mr. Reukauf's questions and complaints. Defense counsel was also concerned that Mr. Reukauf did not understand that he needed to answer questions and would not be allowed to simply speak to the jury. When the trial court told Mr. Reukauf that his lawyer was correct, Mr. Reukauf responded that "that's just completely wrong," and "There's no justice in that." RP (Mar. 27, 2019) at 15. He told the court, "[T]hat deprives me of my First Amendment rights," and "[Y]ou're not gonna dictate or anybody else is not gonna dictate what I'm gonna say about defending myself." RP (Mar. 27, 2019) at 16. The court warned Mr. Reukauf he could lose his right to be present for the trial if he did not follow the court's rules, which upset Mr. Reukauf. Mr. Reukauf continued to interrupt the proceedings and insisted he had the right to do so.

Mr. Reukauf accused his attorney of lying and said if he did not have an "honest lawyer" he would prefer to represent himself. RP (Mar. 27, 2019) at 29. When told he could not insult his attorney in front of the jury, Mr. Reukauf said, "I'm going to. Period." *Id*.

The prosecutor told the trial court there had been discussion about stipulating to Mr. Reukauf's prior convictions, but Mr. Reukauf declined. Defense counsel said he

8

tried to talk to Mr. Reukauf about an *Old Chief*[3] stipulation, but he was not sure Mr. Reukauf understood.  The trial court tried to explain to Mr. Reukauf his right to stipulate to prior offenses rather than have the State prove them, and asked how he wanted to proceed.  Mr. Reukauf responded, "I don't really care, man," and, "Flip a coin."  RP (Mar. 27, 2019) at 45.  The trial court said it would treat Mr. Reukauf's failure to decide as a choice to require the State to prove the convictions.

During the State's case, it offered and the court admitted records of Mr. Reukauf's 1983 conviction for forcible rape in California, 2010 conviction for failure to register as a sex offender in Skamania County, and 2011 conviction for failure to register in Benton County.  Over a defense objection, a State witness testified that the California rape conviction was a felony sex offense.

During Mr. Reukauf's testimony, he recounted a number of instances where he believed the criminal justice system wronged him, including probation officers arbitrarily imposing new conditions.  He told the jury about the Cabal.  He told the jury he had been stabbed in 2017 and the prosecutor made him believe the perpetrator would be sentenced to 25 years to life, but the perpetrator was given a plea agreement for 9 to 12 months.  Mr. Reukauf told jurors, speaking of the man who stabbed him, "[T]here's only one

---

[3] *Old Chief v. United States*, 519 U.S. 172, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997).

9

conclusion I can come to.  They had something on that guy.  He did a job for them, and that's how come he walked free."  RP (Mar. 27, 2019) at 161.

In defense of his failure to check in with Franklin County, he testified,

I'm scared.  I mean, I am scared for my life, and I am so tired of the 11 years of run around and just said, "Hey, it's time for me to take a vacation," which was not the right thing to do.  But I was scared this guy's gonna kill me, and that's why I ran.  That's why I became a fugitive, and that's why I'm sittin' here right now facing this time in prison.

RP (Mar. 27, 2019) at 153.

The jury found Mr. Reukauf guilty.  At Mr. Reukauf's request, the court proceeded immediately to sentencing.  Mr. Reukauf signed an acknowledgement of his criminal history.  The court found his offender score to be 9+ and that he had a standard range of 43 to 57 months.  The court imposed an exceptional mitigated sentence of 36 months based on Mr. Reukauf's age and the time that had passed since his last failure to register.

Mr. Reukauf appeals.

## ANALYSIS

Mr. Reukauf makes four assignments of error.  With respect to one—his challenge to a community custody condition requiring Mr. Reukauf to pay supervision fees as determined by the Department of Corrections—the State does not concede error but does not object to Mr. Reukauf's request that we remand with directions to strike the

condition.  The requested relief is granted.  We address Mr. Reukauf's remaining

assignments of error in the order presented.

I.      THE RECORD IS SUFFICIENT TO ESTABLISH THAT MR. REUKAUF'S 1983
        CALIFORNIA RAPE CONVICTION IS A "SEX OFFENSE" REQUIRING REGISTRATION
        UNDER RCW 9A.44.130

Mr. Reukauf first contends that the evidence was insufficient to find Mr. Reukauf

guilty of failure to register as a sex offender because the State failed to prove that the

California conviction underlying the charge was a sex offense under Washington law.

The obligation to register as a sex offender arises only after conviction for a "sex

offense."  RCW 9A.44.130(1)(a); *State v. Howe*, 151 Wn. App. 338, 343, 212 P.3d 565

(2009).  A sex offense includes "[a]ny out-of-state conviction for an offense . . . that

under the laws of this state would be classified as a sex offense under this subsection."

RCW 9A.44.128(10)(h).[4]  Accordingly, it is an essential element of failing to register that

prior to the charging period, the defendant was convicted of a sex offense, but whether

that prior crime *is* a sex offense presents a question of law.  The element is one that the

Washington pattern jury instructions contemplate being a matter of stipulation or

---

[4] RCW 9A.44.128(10)(h) also provides that "sex offense" includes "[a]ny out-of-state conviction for an offense for which the person would be required to register as a sex offender while residing in the state of conviction."  That portion of the definition, which would encompass Mr. Reukauf's California conviction, was held to be an unconstitutional delegation of legislative authority by this court in *State v. Batson*, 9 Wn. App. 2d 546, 553, 447 P.3d 202 (2019).  The Washington Supreme Court accepted review of *Batson* and heard argument on March 12, 2020.  *State v. Batson*, 194 Wn.2d 1009, 452 P.3d 1225 (2019).

11

instruction by the trial court. *See* 11WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL §§ 49C.02, .10, at 1078, 1098-1101 (4th ed. 2016).

There was no stipulation or jury instruction on the element in the trial below. Still, due process requires that the State prove, beyond a reasonable doubt, every fact necessary to constitute the charged crime. *In re Matter of Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). This includes "legal" facts. Mr. Reukauf is entitled to challenge the legal insufficiency of the State's case, which we review de novo. *State v. Werneth*, 147 Wn. App. 549, 552, 197 P.3d 1195 (2008).

To determine whether an out-of-state conviction qualifies as a "sex offense," a trial court compares the out-of-state statute with the laws of Washington. It is a two-step process, addressing both the legal definitions of the crimes and the facts underlying the convictions. *Howe*, 151 Wn. App. at 343-44.

> First, the trial court must examine the elements of the out-of-state crime and compare them to the elements of the comparable Washington crime. If the crimes have similar elements, the analysis is complete. But, "[i]f the elements are not identical, or the foreign statute is broader than the Washington definition of the particular crime," then, as a second step, the trial court may examine the facts of the out-of-state crime "as evidenced by the indictment or information."

*Id.* (quoting *State v. Morley*, 134 Wn.2d 588, 606, 952 P.2d 167 (1998) (alteration in original) (internal citations and some quotation marks omitted). "[T]he relevant Washington law is that existing at the time of the prior offense." *State v. McCorkle*, 88 Wn. App. 485, 495, 945 P.2d 736 (1997), *aff'd*, 137 Wn.2d 490, 973 P.2d 461 (1991).

In 1983, the California rape statute under which Mr. Reukauf was convicted

provided: "Rape is an act of sexual intercourse accomplished with a person not the

spouse of the perpetrator . . . [w]here it is accomplished against a person's will by means

of force or fear of immediate and unlawful bodily injury on the person or another." Cal.

Stat. ch. 949, § 261(2) (1983). Mr. Reukauf contends this is distinguishable from second

degree rape in Washington, which is defined in relevant part as "sexual intercourse with

another person . . . [b]y forcible compulsion." RCW 9A.44.050(1)(a).[5] "'Forcible

compulsion' means physical force which overcomes resistance, or a threat, express or

implied, that places a person in fear of death or physical injury to herself or himself or

another person, or in fear that she or he or another person will be kidnapped." RCW

9A.44.010.[6]

As the State points out, Washington's crime of third degree rape, defined by RCW

9A.44.060, is also classified as a sex offense that requires registration.[7] At the time of

Mr. Reukauf's failure to register, third degree rape was committed when (a) the victim

did not consent and the lack of consent was clearly expressed or (b) there was a threat of

---

[5] The quoted language remains unchanged from 1983.
[6] The statutory definition remains unchanged from 1983.
[7] The definition of "sex offense" includes "[a]ny offense defined as a sex offense by RCW 9.94A.030." RCW 9A.44.128(10)(a). RCW 9.94A.030(48)(a)(i) defines "sex offense" to include "[a] felony that is a violation of chapter 9A.44 RCW other than RCW 9A.44.132."

substantial unlawful harm to property rights of the victim. Former RCW 9A.44.060(1) (2013). For third degree rape in Washington, there was no burden to prove physical force that overcame resistance.

Mr. Reukauf argues that a conviction for rape in California does not require physical force that overcomes resistance but the second degree rape in the Washington statute does, with the result that the California statute is broader. He argues that because the State did not introduce any evidence of the facts underlying his 1983 rape conviction, nothing in the record supports factual comparability.

We disagree with his contention that the "sex offense" of rape in Washington is not comparable to his California crime of conviction in 1983. In Washington, third degree rape does not require either an offender's use of physical force or a victim's resistance. And as construed by Washington courts, even second degree rape does not require a victim's *physical* resistance, with this court finding that public policy considerations militated against requiring such proof. *State v. McKnight*, 54 Wn. App. 521, 525, 774 P.2d 532 (1989) (citing with approval a California decision, *People v. Barnes*, 42 Cal. 3d 284, 294, 721 P.2d 110, 228 Cal. Rptr. 228 (1986)). *McKnight* was consistent with decisions under Washington's statutes prior to changes enacted in 1975;

14

under that earlier law, the "resistance" mentioned in the former statute was said "not [to be] one of the elements of the crime of rape; it is evidence of want of consent which is an element." *State v. Bridges*, 61 Wn.2d 625, 628, 379 P.2d 715 (1963); *State v. Meyerkamp*, 82 Wash. 607, 609, 144 P. 942 (1914). "[T]he extent of resistance or lack of resistance by the woman [is nothing] other than an item of evidence to be considered by the jury along with all other evidence which bears upon willingness and consent." *State v. Thomas*, 9 Wn. App. 160, 163, 510 P.2d 1137 (1973). It was said that the statute "use[d] the term 'resistance' as meaning opposition, rejection, and refusal—the antonym of consent." *Id.* at 164.

Given the legal comparability of the California crime to Washington crimes that constitute sex offenses requiring registration, the State was not required to present evidence of the facts underlying Mr. Reukauf's 1983 conviction.

II. MR. REUKAUF DOES NOT DEMONSTRATE AN ABUSE OF DISCRETION BY THE TRIAL COURT IN DENYING HIS MOTION TO PROCEED PRO SE

Mr. Reukauf next contends that the court abused its discretion when it denied his motion to proceed pro se.

A defendant possesses a state and federal constitutional right to represent himself. *State v. Curry*, 191 Wn.2d 475, 482, 423 P.3d 179 (2018). The constitutional right of a criminal defendant to self-representation "is so fundamental that it is afforded despite its

potentially detrimental impact on both the defendant and the administration of justice."

*State v. Madsen*, 168 Wn.2d 496, 503, 229 P.3d 714 (2010). Nevertheless, the right to

self-representation contradicts another crucial constitutional right: a defendant's right to

the assistance of counsel. *State v. DeWeese*, 117 Wn.2d 369, 376-77, 816 P.2d 1 (1991).

Trial courts must indulge in every reasonable presumption against a defendant's waiver

of his right to counsel, but the presumption does not give a court carte blanche to deny a

motion to proceed pro se. *Madsen*, 168 Wn.2d at 504.

To waive the right to counsel, a criminal defendant must act knowingly and

intelligently. *Faretta v. California*, 422 U.S. 806, 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562

(1975). He should be made aware of the dangers and disadvantages, so that the record

will establish that he knows what he is doing and his choice is made with eyes wide open.

*Id*. A colloquy on the record is the preferred method of ensuring an intelligent waiver of

the right to counsel. *City of Bellevue v. Acrey*, 103 Wn.2d 203, 211, 691 P.2d 957

(1984).

"A court may not deny a motion for self-representation based on grounds that self-

representation would be detrimental to the defendant's ability to present his case or

concerns that courtroom proceedings will be less efficient and orderly than if the

defendant were represented by counsel." *Madsen*, 168 Wn.2d at 505. Rather, the trial

court may only deny a motion to proceed pro se when the request is equivocal, untimely,

involuntary, or made without a general understanding of the consequences. *Id.* at 504-05.

A court is not required to accept at face value a defendant's statements that he

understands the consequences of his decision. It may conclude that a request is

involuntary or made without a general understanding of the consequences if a lack of

mental capacity raises questions about the defendant's competency—not to stand trial,

but to act as his own counsel. *State v. Englund*, 186 Wn. App. 444, 456-57, 345 P.3d 859

(2015) (citing *In re Pers. Restraint of Rhome*, 172 Wn.2d 654, 660, 260 P.3d 874 (2011)),

*review denied*, 183 Wn.2d 1011 (2015).

Trial courts "have discretionary authority to reject a waiver when mental illness

prevents a defendant from having the ability to present his own case at trial." *State v.*

*Lawrence*, 166 Wn. App. 378, 395, 271 P.3d 280 (2012).

> A searching inquiry into a defendant's mental health status is different from
> an inquiry into a defendant's skill and judgment to act as his own lawyer.
> As *Faretta* instructs, trial courts cannot deny pro se status simply because a
> lay person lacks the training and experience of a lawyer. But trial courts
> may consider that a defendant's mental capacity will have serious and
> negative effects on the ability to conduct a defense. Skill is not the same as
> capacity.

*Rhome*, 172 Wn.2d at 669 (citation omitted). "Self-representation undercuts the right to a

fair trial when the defendant's lack of capacity to conduct a defense threatens an

improper conviction." *Englund*, 186 Wn. App. at 457.

We review decisions to permit or deny self-representation for abuse of discretion.

*Rhome*, 172 Wn.2d at 667. "We give great deference to the trial court's discretion

17

because the trial court is in a favorable position to the appellate courts in evaluating a request to proceed pro se.  Trial judges have more experience with evaluation requests to proceed pro se and have the benefit of observing the behavior, intonation, and characteristics of the defendant during a request." *State v. Burns*, 193 Wn.2d 190, 202, 438 P.3d 1183 (2019).  "So long as a trial court conducted an adequate inquiry into a defendant's request and there is a factual basis for the court's finding that the waiver of counsel was not knowing, intelligent, and voluntary, the trial court's discretionary decision will not be disturbed on appeal." *Id.* at 204.

Mr. Reukauf's request for self-representation presented concerns similar to those in *Englund*, in which Division Two of this court found the trial court properly considered the defendant's mental capacity in denying his motion to proceed pro se.  The defendant had been evaluated and found competent to stand trial, but when questioned by the court to determine whether he should be allowed to procced pro se, his answers did not consistently track the questions asked.  186 Wn. App. at 452.  The trial court concluded Englund "'would not have the capacity to understand and follow the procedural rules in this matter and would thereby be unable to provide for his defense.'" *Id*.  On appeal, this court concluded that the trial court's reasoning was not based on the improper consideration that Englund was unfamiliar with legal rules, but on a proper consideration: his lack of mental capacity to conduct a defense.  *Id.* at 458-59.

Here, too, when being questioned by the trial court, Mr. Reukauf's answers were often nonresponsive. He demonstrated an inability or unwillingness to be redirected to relevant matters, complaining that the State, his attorney, and the court were conspiring against him and denying his First Amendment rights. Mr. Reukauf's conduct demonstrated an inability to follow the proceeding and participate in a relevant way, which would limit his ability to present a defense. Although the court did not use the words "capacity" or "competence" in announcing its decision, it did say, "[Y]ou do not have the ability to represent yourself. . . . The court finds, if I allow you to represent yourself, you would not be able to effectively do that in any way, shape, or sense of the nature of what that requires." RP (Mar. 12, 2019) at 13.

The trial court did refer to Mr. Reukauf's unwillingness to abide by standard "decorum" despite case law holding that the fact that a defendant is "obnoxious" is not a basis for denying self-representation. *Madsen*, 168 Wn.2d at 509. But in ruling on a request for self-representation, a trial court may look to "the defendant's behavior, intonation, and willingness to cooperate with the court." *Burns*, 193 Wn.2d at 203. The trial court also said that for Mr. Reukauf to represent himself would be "materially harmful to the administration of justice," RP (Mar. 12, 2019) at 13, but it also made clear that it was relying on mental health considerations, leading its ruling by stating it had reviewed Dr. Ryan's report. The trial court's comments are reasonably understood to

reflect a concern that Mr. Reukauf lacked the capacity to conduct a defense. No abuse of discretion is shown.

III.     THE RECORD SUPPORTS THE STANDARD RANGE RELIED ON AT SENTENCING

Finally, Mr. Reukauf contends the court improperly included out-of-state offenses in his offender score without a comparability analysis.

A defendant's offender score, together with the seriousness level of his current offense, dictates the standard sentence range used in determining his sentence. RCW 9.94A.530(1). To calculate the offender score, the court relies on its determination of the defendant's criminal history, comprising "the list of a defendant's prior convictions and juvenile adjudications, whether in this state, in federal court, or elsewhere." RCW 9.94A.030(11). A prior conviction from another state is included in a defendant's offender score only if the foreign crime is comparable to a Washington felony. *See id.*; RCW 9.94A.525(3). The State bears the burden of proving by a preponderance of the evidence the existence and comparability of the out-of-state offenses. *State v. Ross*, 152 Wn.2d 220, 230, 95 P.3d 1225 (2004).

Notwithstanding the State's usual burden of proof, where a defendant affirmatively acknowledges that his prior out-of-state conviction is comparable and properly included in his offender score, the trial court needs no further evidence or analysis. *State v. Wilson*, 170 Wn.2d 682, 690, 244 P.3d 950 (2010). In such a case, the

defendant waives the right to later raise a factual dispute over comparability, while retaining the right to later raise a legal dispute. *Ross*, 152 Wn.2d at 231.

At sentencing, the State produced a criminal history that Mr. Reukauf had signed. It included two California convictions and one Oregon conviction. Mr. Reukauf's signature appeared below the statement, "I agree that the above criminal history is true and accurate." CP at 120. There was no written agreement by Mr. Reukauf that the out-of-state convictions listed were for crimes comparable to Washington crimes, however. The signed criminal history did not reflect agreement by Mr. Reukauf to an offender score.

To prove that an out-of-state conviction is comparable to a Washington felony, the State may introduce prior Washington judgments that used the out-of-state convictions to calculate an offender score. *State v. Labarbera*, 128 Wn. App. 343, 349, 115 P.3d 1038 (2005) (citing *State v. Cabrera*, 73 Wn. App. 165, 168-69, 868 P.2d 179 (1994)). Since Mr. Reukauf refused to stipulate at trial to his two prior convictions for failure to register as a sex offender, certified copies of judgment and sentences were offered and admitted as exhibits. Exhibit 3, the judgment and sentence for his 2011 failure to register in Benton County, included his two California convictions in calculating his offender score—sufficient evidence of the comparability of those convictions. Although the Oregon conviction was not included, Mr. Reukauf's offender score when sentenced in this case was a 9+ even without the Oregon conviction. (As the prosecutor pointed out,

Mr. Reukauf's offender score with all three out-of-state convictions was a 10.)  His

standard range was the same with or without proving the comparability of the Oregon

crime.  No error is shown.

### STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds (SAG), Mr. Reukauf provides a

narrative that he says will "explain in detail the evidence that will prove . . . my public

defender in no way planned to defend me honestly but to the contrary conspired with the

prosecutor to convict me."  SAG at 2.  Nothing he identifies offers support for his claim

that his lawyer was conspiring to convict him.

We construe his SAG as a claim of ineffective assistance of counsel.  To prevail

on a claim of ineffective assistance of counsel, a defendant must demonstrate that his

attorney's performance was deficient by showing it was objectively unreasonable and

that but for the alleged deficiency, the outcome of the proceeding would have been

different.  *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

If it is easier to dispose of an ineffectiveness claim on the ground of lack of

sufficient prejudice, which will often be the case, that course should be followed.

*Strickland v. Washington*, 466 U.S. 668, 697, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

It is not enough for a defendant to show that errors had some conceivable effect on the

outcome of the proceeding; he must show that there is a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 693-94.

It is easiest to dispose of Mr. Reukauf's SAG on the basis of his failure to affirmatively demonstrate prejudice. We have considered the acts or omissions of defense counsel that Mr. Reukauf alleges in his SAG. None created or contributed to a reasonable probability that, but for those errors, the result of Mr. Reukauf's trial would have been different.

The conviction is affirmed. We remand with directions to strike the community custody condition included as section 4.2(B)(7) of the judgment and sentence.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Fearing, J.