# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  55098-9-II |
| Respondent, | |
| v. | |
| DUSTIN LEE ZAPEL, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Dustin L. Zapel appeals his convictions for two counts of first degree murder and one count of attempted first degree murder.  He argues that (1) the trial court abused its discretion when it found him competent to stand trial, (2) the State presented insufficient evidence that he was guilty of first degree murder as charged in Count I and Count II, (3) the State presented insufficient evidence that Zapel was guilty of attempted first degree murder, and (4) the prosecuting attorney committed misconduct during closing argument.  Zapel also argues that his judgment and sentence improperly imposed community custody supervision fees after the trial court found him indigent.

We hold that (1) the trial court did not abuse its discretion in ruling that Zapel was competent to stand trial, (2) there was sufficient evidence of premeditation to support the convictions for first degree murder as charged in Counts I and II, (3) there was insufficient evidence to support the conviction for attempted first degree murder, and (4) the prosecuting attorney did not commit misconduct during closing arguments.  Therefore, we affirm Zapel's convictions for first degree murder as charged in Counts I and II, reverse Zapel's conviction for

No. 55098-9-II

attempted first degree murder, and remand to the trial court for entry of the lesser included offense of attempted second degree murder and for resentencing.[1]

FACTS

On July 16, 2017, Zapel killed Thomas West and James Olsen at the Central Park Place Apartments (Central Park) in Vancouver. Following the killings, he armed himself with a knife and followed a third resident, David Garner, who happened across him. The State charged Zapel with two counts of first degree murder (Count I and II) for the killings of West and Olsen, and one count of attempted first degree murder (Count III) for his conduct towards Garner.

A.    CENTRAL PARK PLACE APARTMENTS

Zapel lived at Central Park, which is located on the Veterans Administration (VA) campus in Vancouver. The multi-unit housing complex houses residents from the VA and Columbia River Mental Health.

A number of the residents have mental illnesses, including Zapel, who had a longstanding diagnosis of paranoid schizophrenia. Key components of schizophrenia include hallucinations and delusions. Zapel took prescription medication for his diagnosis.

West, Olsen, and Garner also lived at Central Park. Residents of the apartments could not smoke inside, so they smoked in the designated smoking area of the apartment courtyard. In the smoking area, "[o]ften fights would break out" due to money owed for cigarettes. 4 Verbatim

_____

[1] Because we remand for resentencing, we do not address the issue of community custody supervision fees.

2

Report of Proceedings (VRP) (March 13, 2020) at 1470. The area was "very hostile." 4 VRP (March 13, 2020) at 1470. West and Zapel smoked in a smoking area in the courtyard.

B.      JULY 16, 2017 KILLINGS AND AFTERMATH

On July 16, 2017, the officers from the Vancouver Police Department responded to Central Park and discovered the bodies of West and Olsen in the courtyard's smoking area. The cause of death for each was multiple stab wounds.

Dr. Dennis Wickham, a forensic pathologist, testified that West sustained 26 stab wounds and Olsen sustained 18 or 19 stab wounds. Olsen's body was on his back thirty feet from West's body, which was still sitting in a chair that was tipped over. West's arm was extended forward at a 45 degree angle.

Video surveillance shows what occurred in the moments leading to West's and Olsen's deaths. The video shows that Zapel went into the courtyard through the building's common area, which included the kitchen. West was in the courtyard. Zapel ran back to the kitchen and retrieved a knife and then returned outside, stabbing West repeatedly.

After killing West, Zapel started back toward the kitchen and encountered Olsen. He immediately attacked Olsen, stabbing him repeatedly until Olsen fell to the ground. Olsen acted to defend himself from Zapel. The video shows Zapel switching the knife from one hand to the other during the stabbing. Zapel paused during the stabbing but resumed once Olsen moved. After killing Olsen, Zapel returned to the kitchen and put the knife in a drawer. Zapel then rolled up his sleeves, washed his hands, and used a paper towel to dry them.

The video then shows David Garner entering the kitchen. Upon seeing Garner, Zapel grabbed a second knife and immediately moved toward Garner. Garner left the kitchen, and Zapel followed him with the knife.[2]

After leaving the kitchen, Zapel put the second knife in his jacket. Zapel exited Central Park and hid the knife in a bushy area on the VA campus. Zapel then left the VA campus.

Law enforcement later identified Zapel as the assailant. Law enforcement discovered the bloodstained knife used to kill West and Olsen in the kitchen drawer at Central Park. Using a canine unit, they discovered a kitchen knife in a bushy area on the VA campus. Citizen volunteers assisted police in locating Zapel's blood stained San Francisco 49ers jacket, which was found hanging on a post at a bus station on Fourth Plain Boulevard in Vancouver.

Later that morning, law enforcement detained Zapel walking without his San Francisco 49ers jacket and with an injury on one of his hands. Zapel had blood stains on his pants and hands.

C.      ZAPEL'S POLICE INTERVIEW

After his arrest, Zapel agreed to an interview with police. During the interview, Zapel made repeated references to a "fake head." Ex. 314 at 29, 36, 38. He also explained that while in his bed that night, he felt as if his "brain was shuttin' down" and he "had to do somethin' violent."

---

[2] Police interviewed Garner regarding his encounter with Zapel. Garner stated that before walking to the building's common area, he was in his room with the window open. He heard a noise from the courtyard and thought perhaps someone was having a seizure, so he went to investigate. He entered the kitchen, and he saw Zapel with a knife. Garner stated that Zapel "[p]icked up the—I mean, wielded the knife in my direction and then headed towards me with the knife." Ex. 301 at 8. Garner stated that Zapel walked briskly in his direction; however, that was Zapel's usual manner of walking. Garner went back to his room and locked the door so he could assess the situation. Garner eventually decided to leave his room, got in his car, and drove to a parking lot to call 911.

Ex. 314 at 17, 29. Zapel also said at one point he had thoughts of killing other people all the time. And he did not think he would get in trouble because everybody does it. Zapel also stated that he had tried to stab Garner, "I lunged at him and stuck my arm out." Ex. 314 at 49.

Zapel made other statements during the police interview, including telling officers that he was "[l]ocked up for 500 years in prison," and "I was made in a lab." Ex. 314 at 48, 53. Zapel also mentioned the military and CIA. In reference to Olsen, when asked where he thought Olsen was, Zapel replied, "Probably at home, laughing about the whole story."[3] Ex. 314 at 51. The Officer also asked, "You knew he was a real person, right?" Ex. 314 at 51. Zapel replied, "I don't think I would hurt anyone." Ex. 314 at 51.

The State charged Zapel in an amended information with two counts of first degree murder (West and Olsen) and one count of attempted first degree murder (Garner). On each count, the State alleged that Zapel was armed with a deadly weapon during the commission of the crimes.

D.    COMPETENCY HEARING

On May 3, 2018, the trial court held a competency hearing at which it heard testimony from two experts. The trial court also had before it numerous forensic psychological evaluations prepared between 2005 and 2009, which showed that Zapel had a consistent diagnosis of paranoid schizophrenia since January 2004.

---

[3] At trial, on cross examination by defense counsel, Officer Neil Martin of the Vancouver Police Department agreed with defense counsel that Zapel stated during his police interview that West was probably at home laughing at the whole story. The interview transcript, however, shows that the interviewing officer inquired about "the second guy that you stabbed." Ex. 314 at 51. Zapel stated that he believed Olsen was "[p]robably at home, laughing about the whole story." Ex. 314 at 51.

Christopher Kirk Johnson, Ph.D., a licensed psychologist, testified that he evaluated Zapel at the Clark County Jail on three occasions. On a fourth occasion, Zapel refused to see him. Dr. Johnson reviewed previous evaluations from Western State Hospital, the evaluation by Dr. Kenneth Dudley, and the jail medical records. He also watched the video surveillance of the alleged crime. Dr. Johnson stated that Zapel's consistent diagnosis over approximately 14 years was paranoid schizophrenia. This manifests in hallucinations and delusions. Dr. Johnson evaluated Zapel's ability to understand the court proceedings and his ability to assist his attorney.

Dr. Johnson testified as to Zapel's understanding of the legal proceedings against him. Dr. Johnson opined that Zapel had an understanding of the legal process, including the roles of the attorneys, the court and the nature of any potential pleas, as well as the allegations against him. Dr. Johnson stated that in his last interview with Zapel, Zapel appeared to understand that he was charged with a serious crime. According to Dr. Johnson, however, Zapel did not appear to understand the importance of detailing what occurred on the night of the incident. Dr. Johnson explained that Zapel's response to his attorney would have "a lot of variability." 1 VPR (May 3, 2018) at 75. This meant that Zapel's willingness to cooperate with defense counsel and act in his own best legal interest would vary. Dr. Johnson concluded, "when I saw [Zapel] my feeling was he was not . . . able to cooperate. The issue can be raised as to whether or not that is something he's doing consciously." 1 VRP (May 3, 2018) at 77.

Kenneth Dudley, Ph.D., a forensic psychologist for the State of Washington, testified that he examined Zapel on two occasions while Zapel was in jail. Dr. Dudley agreed that Zapel had paranoid schizophrenia. Dr. Dudley believed that, during his interviews, Zapel had the "ability to

6

understand the charges, the attorneys' roles." 1 VRP (May 3, 2018) at 87. Dr. Dudley also believed that Zapel had the ability to work with his attorney "in a reasonable and rational manner." 1 VRP (May 3, 2018) at 88. Dr. Dudley stated that after observing Zapel at the competency hearing, he maintained that belief.

During the hearing, Zapel appeared to confess to the killings in open court. Zapel stated, "What defense? I did it. What of it?" and "There I did it. What of it? I need no defense." 1 VRP (May 3, 2018) at 92. Zapel later stated, "I don't even care. You can forget everything I ever said except for I did it. I stabbed the guy. That's all I can say." 1 VRP (May 3, 2018) at 101.

Zapel also made statements that showed a desire to be represented by the prosecuting attorney, stating that he wanted "a new attorney," and "I want a new judge too" and "[t]his is pointless." 1 VRP (May 3, 2018) at 90-91. Zapel requested that the trial court rely on the prosecuting attorney's theory of the case.

Defense counsel's argument emphasized that both experts questioned Zapel's ability to cooperate with defense counsel. Defense counsel stated that based on Zapel's history of paranoid schizophrenia, "his ability to . . . cooperat[e] will be variable almost from a day-to-day or one section of a hearing to another." 1 VRP (May 3, 2018) at 99. Defense counsel also told the trial court that an "enormous amount of evidence . . . would indicate [Zapel is] the person involved in the stabbing." 1 VRP (May 3, 2018) at 99. Therefore, one would lean toward a defense of diminished capacity or insanity; however, "[Zapel is] quite reluctant to talk about these things and put us in a position to help him, which leads to this question of whether he's competent to be on trial if he can't help himself." 1 VRP (May 3, 2018) at 99. Defense counsel also discussed Zapel's

desire to have the prosecuting attorney represent him, stating, "I don't think [Zapel] understands how things work if he thinks that's going to happen. So I think the Court's left with finding him incompetent." 1 VRP (May 3, 2018) at 100.

The trial court issued its ruling, relying on the August 23, 2017 competency report completed by Dr. Dudley and testimony given by Dr. Dudley at the May 3, 2018 hearing, which indicated that "[Zapel] understands the nature of the proceedings and the defendant is able to assist in his own defense." Clerk's Papers (CP) at 201. The trial court concluded that Zapel was competent to stand trial and found that

> the last time Dr. Johnson saw the defendant . . . the defendant did not have the ability to cooperate with counsel, period. Dr. Johnson feels this may have been intentional; the defendant is not willing to talk about the factual events of the crime.
>
> . . . .
>
> . . . in Dr. Dudley's opinion the defendant has the ability to cooperate with his attorney.

1 VRP (May 3, 2018) at 103-104.

On October 8, 2019, the defense moved for reconsideration of the trial court's finding of competency to stand trial made 17 months earlier in May 2018. The trial court denied the motion for reconsideration.

E.    TRIAL TESTIMONY

During trial, the surveillance video showing the stabbings of West and Olsen was played for the jury. The video surveillance from the VA campus showing Zapel leaving the campus after stopping in a bushy area was also shown to the jury.

Relevant to the issues raised on appeal, the jury heard from the following witnesses.

8

Rosalinda Valdezpenia testified that Zapel informed her that he had been charged with two other felonies in the past. He told her that he was sent to Western State Hospital, and "'I got away with it,'" with regard to one of the times that he was charged with an offense. 4 VRP (March 13, 2020) at 1461. Valdezpenia testified that, about a week before the stabbings, she counted Zapel's medication and noticed that the pill container had two extra pills.

Robert Mackinnon testified that Zapel had stated that he could not stand West. Zapel, however, never mentioned harming or killing West.

Robert Ewing testified that Zapel told him that he "wonder[ed] what it would feel like to really clobber somebody." 4 VRP (March 12, 2020) at 1372. Ewing also testified that Zapel "had problems with several people" and "he seemed like a troubled kid and had trouble getting along with people." 4 VRP (March 12, 2020) at 1374. Zapel had said to Ewing, "I wonder what it would feel like to kill someone." 4 VRP (March 12, 2020) at 1372. According to Ewing, West and Zapel had a "competition and sort of adversarial situation" in which they would compete in borrowing cigarettes. 4 VRP (March 12, 2020) at 1376. Ewing stated, however, that he never personally saw Zapel's reaction to this "cigarette borrowing competition." 4 VRP (March 12, 2020) at 1376.

Dr. Dudley testified that during the competency hearing on May 3, 2018, Zapel made comments while the video of the killings was played. Dr. Dudley testified that Zapel stated, "[T]here were two Daves" and "'[t]hat one . . . he was scared but nothing happened to him.'" 4 VRP (March 16, 2020) at 1573. Later, Zapel stated, "'they had been picking on me for a couple of months'" and "'I had to do it'" or "'I wanted to do it'" and "'I had to let off some steam. It felt good to do that.'" 4 VRP (March 16, 2020) at 1573-74.

Dr. Johnson testified that Zapel first said that he did not engage in the conduct for which he was accused. Dr. Johnson stated that someone can "be delusional and still act intentionally." 4 VRP (March 16, 2020) at 1590. Dr. Johnson also stated that the inability to form intent because one has mental illness is rare.

Christopher Cadle, Ph.D., a licensed psychologist and forensic evaluator, testified that he attempted to interview Zapel five times unsuccessfully due to Zapel's unwillingness to participate. Dr. Cadle stated that a person with schizophrenia can still act with intent or premeditation. He opined that at the time of the killings, Zapel had a mental disorder. Dr. Cadle stated, however, that at the time of the killings, Zapel could form intent. Dr. Cadle also stated that Zapel had the capacity to premeditate. Dr. Cadle contrasted the actions of a person who is flailing and unable to form intent with Zapel's actions. He stated that Zapel walked purposefully as if he had a place in mind when he returned to the kitchen to retrieve a kitchen knife. Dr. Cadle also stated, "[T]hat's very goal-directed behavior, very purposeful behavior. So he goes in, finds the drawer where the knife is, takes the knife out, and then walks out." 4 VRP (March 16, 2020) at 1644.

Leslie Goldmann, Ph.D., a clinical psychologist, testified that schizophrenia "impairs one's ability to think rationally to behave in an organized fashion." Dr. Goldmann opined that the illness can affect one's ability to premeditate a crime. Dr. Goldmann also stated that it could impair one's ability to act with intent.

Washington State Patrol Crime Lab forensic scientist David Stritzke testified that the DNA profile from the knife blade found in the kitchen at Central Park matched the profile of Olsen, and

the knife handle matched the DNA profile of Zapel and West as contributors. Stritzke also tested

the recovered jacket and found DNA that matched the profiles of West and Zapel.

F.    JURY INSTRUCTIONS

The trial court instructed the jury on the crime of first degree murder and attempted first

degree murder. The trial court instructed as follows:

> A person commits the crime of murder in the first degree when, with a premeditated intent to cause the death of another person, he or she causes the death of such person.

CP at 1896.

> A person acts with intent or intentionally when acting with the objective or purpose to accomplish a result that constitutes an element of a crime.

CP at 1897.

> Premeditated means thought over beforehand. When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditated. Premeditation must involve more than a moment in point of time. The law requires some time, however long or short, in which a design to kill is deliberately formed.

CP at 1898.

> A person commits the crime of attempted murder in the first degree when, with intent to commit that crime, he or she does any act that is a substantial step toward the commission of that crime.

CP at 1912.

> A substantial step is conduct that strongly indicates a criminal purpose and that is more than mere preparation.

CP at 1913.

11

The trial court also instructed the jury on the lesser included crimes of second degree murder and attempted second degree murder.

G.     CLOSING ARGUMENTS

During closing arguments, the prosecuting attorney made several comments that Zapel now challenges on appeal.

The State argued:

> Now, what is our evidence of premeditation?  He grabs a knife, more than a moment in point of time, runs back outside.  Again, more than a moment in a point of time.  Stabs [West] and [Olsen] over and over and over again.  Again, more than a moment in point of time.  As he's killing [Olsen], he pauses and then stabs, then pauses again and then stabs.

5 VRP (March 17, 2020) at 1890.  Zapel objected, stating that the State's argument conflated "premeditation with intent to be the same physical act."  5 VRP (March 17, 2020) at 1890.  The trial court overruled the objection, stating that the parties had "broad discretion during closing to make arguments . . . they wish to make."  5 VRP (March 17, 2020) at 1890.

Later, the State argued:

> Your role is to determine whether the State has proved the elements of the crimes before you beyond a reasonable doubt, those to-convict instructions that the judge gave you.  Those are the elements that you are to consider, having to prove intent and premeditated intent.
>     And you heard that someone who is insane, who is delusional, can still act with intent.  And the evidence shows you that the defendant did act with intent and that that intent was clearly premeditated.

5 VRP (March 17, 2020) 1892-93.  Zapel again objected, "Again, objection.  Confusing, melting together concepts we talked about before that don't fit."  5 VRP (March 17, 2020) at 1893.  The trial court overruled the objection.

During rebuttal, the State argued:

And you'll note from your jury instructions that it's a premeditated intent, so it goes to the intent and whether that intent was premeditated.

5 VRP (March 17, 2020) at 1946. Zapel again objected on the basis that the prosecuting attorney misstated the law, "[P]remeditation and intent are separated." 5 VRP (March 17, 2020) at 1946. The trial court overruled the objection, "That's true, but at this point, this is argument. Objection overruled." 5 VRP (March 17, 2020) at 1946.

H.     VERDICT, SENTENCE, AND APPEAL

The jury found Zapel guilty of first degree murder (Counts I and II) and attempted first degree murder (Count III). The jury also found by special verdict that Zapel committed each crime while armed with a deadly weapon.

Zapel moved for a new trial or arrest of judgment on a number of grounds, including that insufficient evidence existed to support a finding that Zapel acted with intent, insufficient evidence existed to show that he acted with premeditation, and on the basis of prosecutorial misconduct. The trial court denied the motion.

At sentencing, the trial court sentenced Zapel to a mid-range sentence of 792 months in custody and 36 months of community custody. The trial court found Zapel indigent and imposed a mandatory $500 victim assessment fee and a mandatory DNA collection fee. The trial court also ordered Zapel to "pay [community custody] supervision fees as determined by [Department of Corrections]." CP at 2076.

Zapel appeals.

13

No. 55098-9-II

ANALYSIS

A.    COMPETENCY DETERMINATION

Zapel contends that the trial court incorrectly concluded that he was capable of assisting in his own defense.  Zapel argues that the trial court failed to give adequate weight to defense counsel's opinion regarding Zapel's lack of competency, Dr. Johnson's testimony, and Zapel's extensive history of mental illness.  He also challenges the trial court's finding that Dr. Johnson felt that Zapel's failure to cooperate with counsel "'may have been intentional.'"  Br. of Appellant at 22 (quoting 1 VRP (May 3, 2018) at 103).[4]

The trial court has wide discretion in determining whether a defendant is competent to stand trial.  *State v. Ortiz*, 104 Wn.2d 479, 482, 706 P.2d 1069 (1985), *cert. denied*, 476 U.S. 1144 (1986).  Therefore, we review a trial court's competency determination for an abuse of discretion. *Id*; *State v. Ortiz-Abrego*, 187 Wn.2d 394, 402, 387 P.3d 638 (2017).

A trial court abuses its discretion when its decision is based on "the wrong legal standard or is unsupported by the record."  *Ortiz-Abrego*, 187 Wn.2d at 402.  "We normally defer to the trial court's competency determination because the trial court can personally observe the individual's behavior and demeanor."  *State v. Crenshaw*, 27 Wn. App. 326, 330, 617 P.2d 1041 (1980), *aff'd*, 98 Wn.2d 789 (1983).

---

[4] Zapel also contends that the trial court failed to conduct a proper competency hearing; however, Zapel fails to present any argument showing why the hearing was improper.  Therefore, we decline to address this argument. *In re Disciplinary Proc. Against Jensen*, 192 Wn.2d 427, 449, 430 P.3d 262 (2018).

"It is a fundamental principle of state and federal law that incompetent defendants may not stand trial." *State v. Coley*, 180 Wn.2d 543, 551, 326 P.3d 702 (2014), *cert. denied*, 574 U.S. 1174 (2015). The "party challenging competency" has the burden to "prove by a preponderance of the evidence that the defendant is incompetent." *Id.* at 555.

"[A] defendant is competent to stand trial if he has the capacity to understand the nature of the proceedings against him and he can assist in his own defense." *Id.* at 551-52; Former RCW 10.77.010(15) (2019), RCW 10.77.050. A trial court may consider "'many things, including the defendant's appearance, demeanor, conduct, personal and family history, past behavior, medical and psychiatric reports and the statements of counsel'" when rendering a decision. *Ortiz-Abrego*, 187 Wn.2d at 404 (quoting *State v. Dodd*, 70 Wn.2d 513, 514, 424 P.2d 302, *cert. denied*, 387 U.S. 948 (1967)). "The mere existence of a mental disorder or the existence of delusions does not prevent a defendant from being competent." *State v. Fedoruk*, 5 Wn. App. 2d 317, 335, 426 P.3d 757 (2018). A defendant with a current mental disorder is able to assist in his own defense when

> he "posses[es] an adequate recall of the factual events involved in the charge against him, [is] able to communicate those recollections to his attorney, and ha[s] both an intellectual and emotional appreciation of the ramifications and consequences of the crime charged."

*State v. McCarthy*, 193 Wn.2d 792, 806, 446 P.3d 167 (2019) (alterations in original) (quoting 12 ROYCE A. FERGUSON, JR., WASHINGTON PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 902, at 171 (3d ed. 2021)). An expert opinion that a defendant is competent provides a tenable basis for a competency determination. *State v. Lawrence*, 166 Wn. App. 378, 389, 271 P.3d 280, *review denied*, 174 Wn.2d 1009 (2012).

1.      Finding With Regard To Dr. Johnson

As an initial matter, Zapel challenges the trial court's finding that Dr. Johnson felt that Zapel's failure to cooperate with counsel "'may have been intentional.'" Br. of Appellant at 22 (quoting 1 VRP (May 3, 2018) at 103). Zapel argues the trial court erred because Dr. Johnson opined that Zapel's unwillingness to cooperate with counsel was "'most likely . . . based on his mental illness.'" Br. of Appellant at 22 (quoting 1 VRP (May 3, 2018) at 79).

At the competency hearing, Dr. Johnson twice testified that an issue remained as to whether Zapel was "consciously" not cooperating or "not willing" to cooperate. 1 VRP (May 3, 2018) 77. Because Dr. Johnson stated that Zapel's lack of cooperation may stem from an unwillingness rather than an inability to cooperate, the trial court did not err in finding that Dr. Johnson felt Zapel's failure to cooperate with counsel may have been intentional.

2.      Trial Court's Discretionary Competency Ruling

Dr. Johnson and Dr. Dudley testified at the competency hearing. Dr. Johnson opined that Zapel's competency would vary, specifically his ability to assist defense counsel. He stated that it appeared Zapel could not "make the connection between . . . the need to talk about the conduct and how that might be in his best interests because he has relatively limited options here in terms of how to manage this situation." 1 VRP (May 3, 2018) at 77. Dr. Johnson also stated that an issue remained as to whether Zapel could not or would not cooperate.

Dr. Dudley conducted multiple evaluations of Zapel in jail and reviewed Zapel's extensive history of mental illness. Dr. Dudley believed Zapel to be competent. Dr. Dudley opined that Zapel could understand the nature of the court proceedings and had the ability to cooperate with

his attorney. Dr. Dudley also observed Zapel's behavior during the hearing, where Zapel appeared to confess to the murders and indicated that the prosecuting attorney should represent him. Dr. Dudley testified that, notwithstanding Zapel's behavior during the hearing, he maintained his belief in Zapel's competency.

Here, the trial court had before it psychological reports, which evidenced Zapel's long history of mental illness. The trial court explicitly stated that, in reaching its decision, it had considered the reports and its own notes from the hearing. The trial court made findings of fact which referenced the testimony presented from both Dr. Johnson and Dr. Dudley. And the trial court relied on the opinion of Dr. Dudley, who found Zapel competent to stand trial. Because the trial court considered all the evidence, including the opinion of Dr. Dudley, who opined that Zapel was competent to stand trial, the trial court had a tenable basis on which to conclude that Zapel was competent. The trial court's decision regarding competency was supported by the record, and therefore, the trial court did not abuse its discretion in making its competency determination.

B.     SUFFICIENCY OF THE EVIDENCE—FIRST DEGREE MURDER

Zapel contends that the State failed to prove premeditation beyond a reasonable doubt, and therefore, his convictions for murder in the first degree must be reversed with instructions for dismissal of the charges. We disagree.

1.     Legal Principles

The State must prove each element of a crime charged beyond a reasonable doubt. *State v. Anderson*, 198 Wn.2d 672, 686, 498 P.3d 903 (2021). When a defendant challenges the sufficiency of the evidence, "'the relevant question is whether, after viewing the evidence in the

light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019) (internal quotation marks omitted) (quoting *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (plurality opinion)), *cert. denied*, 140 S. Ct. 834 (2020). "'When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant.'" *State v. Kintz*, 169 Wn.2d 537, 551, 238 P.3d 470 (2010) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). "'A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom.'" *Id*. (quoting *Salinas*, 119 Wn.2d at 201). "'Circumstantial evidence and direct evidence are equally reliable in determining the sufficiency of the evidence.'" *Scanlan*, 193 Wn.2d at 770 (internal quotation marks omitted) (quoting *Kintz*, 169 Wn.2d at 551). "However, inferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013). A claim of insufficiency of the evidence is reviewed de novo. *State v. Berg*, 181 Wn.2d 857, 867, 337 P.3d 310 (2014).

The element of premeditation differentiates murder in the first degree from murder in the second degree. *State v. Bingham*, 105 Wn.2d 820, 823, 719 P.2d 109 (1986). Premeditation requires "more than a moment in point of time." RCW 9A.32.020(1). "The State must show 'the deliberate formation of and reflection upon the intent to take a human life,'" which "'involves the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short.'" *State v. Hummel*, 196 Wn. App. 329, 354, 383 P.3d 592 (2016) (quoting

*State v. Hoffman*, 116 Wn.2d, 82-83, 804 P.2d 577 (1991)). The opportunity to deliberate, by itself, is insufficient to prove premeditation. *Id*. "The State can prove premeditation by circumstantial evidence 'where the inferences drawn by the jury are reasonable and the evidence supporting the jury's finding is substantial.'" *Id*. at 355 (quoting *State v. Pirtle*, 127 Wn.2d 628, 643, 904 P.2d 245 (1995), *cert. denied*, 518 U.S. 1026 (1996)). "Four characteristics of the crime are particularly relevant to establish premeditation: motive, procurement of a weapon, stealth, and the method of killing." *Pirtle*, 127 Wn.2d at 644.

2.      Evidence On Premeditation

The State argues that evidence is sufficient to show premeditation. In support, the State relies on *State v. Ortiz*, 119 Wn.2d 294, 831 P.2d 1060 (1992) (lead opinion of Durham, J.), (concurring opinion of Dolliver, J.), and *State v. Aguilar*, 176 Wn. App. 264, 308 P.3d 778 (2013), *review denied*, 179 Wn.2d 1011 (2014), and argues that these cases are not meaningfully distinguishable from the present case.

In *Ortiz*, the Supreme Court found sufficient evidence of premeditation where the defendant (1) committed the killing with a knife and inflicted multiple wounds; (2) the "knife was procured on the premises" but the "murder occurred in a bedroom, and not in the kitchen where the knife was found[;]" (3) "[t]he victim was struck in the face with something other than the knife[;]" and (4) "the defensive wounds found on the victim indicate a prolonged struggle." 119 Wn.2d at 312-13.

In *Aguilar*, the court again found sufficient evidence of premeditation where the defendant (1) "had a motive to kill his wife—her possible involvement with another man[;]" (2) first hit his

wife and then continued his attack by stabbing her; (3) "instituted his plan to kill his wife by leaving the living room to procure a weapon, a knife, from the kitchen[;]" (4) used stealth to evade his 13-year-old daughter in order to continue his attack; and (5) finally, engaged in a "lengthy and excessive attack." 176 Wn. App. at 273-74.

The State also relies on *State v. Sargent*, 40 Wn. App. 340, 353, 698 P.2d 598 (1985), in which the court found premeditation could be inferred from the facts after considering that "the victim was struck by two blows to the head with some interval passing between them," and *State v. Gibson*, 47 Wn. App. 309, 312, 734 P.2d 32, *review denied*, 108 Wn.2d 1025 (1987), in which this court found premeditation when the evidence showed a "a sufficient lapse of time between the beating and strangulation."

The State further cites to *Pirtle*, in which, among other facts, the Supreme Court considered that the defendant had the presence of mind to clean himself and his car, and hide evidence. 127 Wn.2d at 645. The State argues that, like the defendant in *Pirtle*, Zapel's behavior after the attacks, including washing his hands, fleeing the scene, and discarding his jacket, show that Zapel acted with premeditation.

In drawing parallels between Zapel's conduct and the premeditated conduct in the cases it cites, the State asserts that Zapel had a motive to kill West. The State points to the evidence that Zapel once stated he could not stand West. And Ewing, a resident at Central Park, testified that Zapel had a "sort of adversarial situation" with West in which Zapel and West competed in borrowing cigarettes. 4 VRP (March 12, 2020) at 1376. Also, Zapel told police that he "had to do somethin' violent" and he "went to go kill [West]." Ex. 314 at 29. With regard to Olsen, the

State asserts premeditation is shown when Zapel paused during his killing of Olsen and moved the knife from one hand to the other. The State also asserts that premeditation is shown by Zapel's lengthy attack of his victims with multiple stab wounds.

Here, viewing the facts in the light most favorable to the State, there is sufficient evidence showing that Zapel acted with premeditation when he killed West. There is evidence that Zapel could not stand West. And there is evidence that Zapel had entertained thoughts about hurting someone, and in particular, "what it would feel like to kill someone." 4 VRP (March 12, 2020) at 1372-1374.

The video shows that Zapel walked through the kitchen and out to the courtyard. After encountering West in the courtyard, Zapel returned to the kitchen, secured the murder weapon from the kitchen counter, returned to the courtyard, and stabbed West. Zapel stabbed West 26 times. Zapel then attempted to erase signs of the crime by placing the murder weapon in a kitchen drawer, washing his hands, leaving the VA campus, and eventually discarding the jacket he wore during the crime.

Viewing the evidence in the light most favorable to the State, the evidence shows that Zapel disliked West, had thoughts about hurting or killing someone, deliberately went into another room to procure the murder weapon after encountering West in a different location, brutally killed West, and attempted to get rid any evidence of the crime that could implicate him. Because Zapel's actions show the deliberate formation of an intent to take a human life, sufficient evidence supports the first degree murder conviction as to West.

And, viewing the evidence in the light most favorable to the State, the evidence is also sufficient to show that Zapel acted with premeditation as to Olsen. Zapel encountered Olsen by chance and then stabbed him 18 or 19 times. Although the meeting with Olsen was by chance, the video shows a prolonged struggle in which Olsen attempted to defend himself from Zapel. During the attack on Olsen, Zapel paused, but he resumed stabbing Olsen when Olsen began to move. Afterward, Zapel hid evidence of his involvement by putting the knife in a kitchen drawer, washing his hands, leaving the scene, and discarding the jacket he was wearing. This evidence supports a finding that Zapel deliberately formed an intent to take Olsen's life. Therefore, sufficient evidence supports the first degree murder conviction as to Olsen.

In sum, the jury had before it sufficient evidence of premeditation on the first degree murder charges. Because sufficient evidence supported a finding of premeditation and the jury did not merely speculate as to whether Zapel deliberated, Zapel's sufficiency of the evidence challenge fails.

C.      SUFFICIENCY OF THE EVIDENCE—ATTEMPTED FIRST DEGREE MURDER

Zapel contends that the attempted first degree murder conviction must also be reversed as insufficient evidence showed that he acted with premeditated intent or that he took a substantial step toward committing first degree murder. We agree that there is insufficient evidence to show Zapel acted with premeditated intent as to the attempted first degree murder charge.

      1.      Premeditated Intent[5]

In order to convict a defendant of attempted first degree murder, a jury must find that the defendant "took a substantial step toward committing first-degree murder with the premeditated intent to cause the death of another." *State v. Orn*, 197 Wn.2d 343, 363, 482 P.3d 913 (2021); *State v. Barajas*, 143 Wn. App. 24, 36, 177 P.3d 106 (2007), *review denied*, 164 Wn.2d 1022 (2008). Again, the four characteristics that are "particularly relevant" when considering whether premeditation was established include "motive, procurement of a weapon, stealth, and the method of killing." *Pirtle*, 127 Wn.2d at 644.

Here, the evidence is insufficient to show that Zapel attempted to kill Garner with premeditated intent. After killing Olsen, Zapel returned to the kitchen to put the knife used to kill West and Olsen away. Zapel then washed his hands. At that time, Garner entered the kitchen and saw Zapel. Upon seeing Garner, Zapel immediately grabbed a second knife and moved toward Garner. The video shows Garner leaving the kitchen as Zapel follows him with the second knife. The events happened rapidly, and the video shows no opportunity for deliberation. Because there

---

[5] The State contends that premeditation is not an essential element of attempted first degree murder, citing to *State v. Boswell*, 185 Wn. App. 321, 340 P.3d 971 (2014), *review denied*, 183 Wn.2d 1005 (2015) and *State v. Besabe*, 166 Wn. App. 872, 271 P.3d 387, *review denied*, 175 Wn.2d 1003 (2012). It argues that nonetheless, it proved that Zapel acted with premeditated intent.

Pursuant to *Boswell* and *Besabe*, a trial court is not required to include premeditation as an essential element of the "to convict" jury instruction for attempted first degree murder. *Boswell*, 185 Wn. App. at 335-37; *Besabe*, 166 Wn. App. at 883-84. However, the jury instructions as a whole must instruct the jury that the State maintains the burden of proving that a defendant acted with premeditation. *State v. Orn*, 197 Wn.2d 343, 361, 482 P.3d 913 (2021). Therefore, here, the State was required to prove that Zapel acted with premeditated intent.

is no evidence of deliberation with regard to Garner, there is insufficient evidence to prove that Zapel acted with premediated intent in his attempt to kill Garner.

2.      Substantial Step

Zapel also argues that the State failed to show that he took a substantial step toward committing first degree murder. He argues that "[a] jury could reasonably infer that Mr. Zapel was attempting to scare, threaten, intimidate or chase away Mr. Garner so that Mr. Zapel could escape from the crime scene." Br. of Appellant at 38.

"A person is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime." RCW 9A.28.020(1). In order for a defendant's conduct to constitute a substantial step, it must be "strongly corroborative of the actor's criminal purpose." *State v. Workman*, 90 Wn.2d 443, 452, 584 P.2d 382 (1978). "[A]ny act done in furtherance of the crime constitutes an attempt if it clearly shows the design of the defendant to commit the crime." *State v. Wilson*, 158 Wn. App. 305, 317, 242 P.3d 19 (2010). "Whether conduct constitutes a substantial step is a question of fact." *Id.*

Here, when Zapel saw Garner, Zapel immediately armed himself with a knife and moved towards Garner. Viewing the facts and reasonable inferences in the light most favorable to the State, a jury could find that Zapel armed himself and moved toward Garner in order to effectuate a third killing. Because Zapel armed himself with a knife and moved toward Garner, a jury could determine that Zapel took a substantial step towards killing Garner.

The evidence shows that Zapel took a substantial step toward killing Garner; however, the State failed to prove that Zapel acted with premeditation. Thus, there is insufficient evidence to support Zapel's conviction for attempted first degree murder.

3.    Remand Is Required

Zapel seeks reversal and dismissal of his attempted first degree murder conviction due to insufficiency of the evidence to support the conviction. The State responds that the correct action is to remand for entry of the lesser included offense for that crime. We agree with the State.

"When the evidence is insufficient to support a conviction and the conviction is reversed, we may remand for entry of an amended judgment on a lesser included offense." *State v. Hutchins*, 73 Wn. App. 211, 218, 868 P.2d 196 (1994). "[R]emand for resentencing on a lesser included offense is appropriate only when the jury was explicitly instructed on the lesser offense." *State v. Richardson*, 12 Wn. App. 2d 657, 667, 459 P.3d 330 (2020). "Based upon the giving of such an instruction it has been held that the jury necessarily had to have disposed of the elements of the lesser included offense to have reached the verdict on the greater offense." *State v. Green*, 94 Wn.2d 216, 234, 616 P.2d 628 (1980) ( italics omitted) (lead opinion of Stafford, J.), 235 (concurring opinion of Utter, C.J.). Second degree murder is a lesser included offense of first degree murder. *State v. Mullins*, 158 Wn. App. 360, 371, 241 P.3d 456 (2010), *review denied*, 171 Wn.2d 1006 (2011).

Here, the jury was instructed on the lesser included offense of attempted second degree murder. Therefore, with regard to the attempted first degree murder conviction, we reverse that

conviction and remand for entry of judgment on the lesser included crime of attempted second degree murder.

D.      PROSECUTORIAL MISCONDUCT

Zapel argues that the prosecuting attorney committed misconduct during closing arguments.  We disagree.

When making a claim of prosecutorial misconduct, the defendant bears the burden of proving that a prosecutor's conduct was improper and prejudicial.  *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011).  We first evaluate whether the prosecuting attorney's comments were improper.  *State v. Emery*, 174 Wn.2d 741, 759, 278 P.3d 653 (2012).  If the prosecuting attorney made improper statements, we then determine if the conduct prejudiced the defendant. *Id.* at 760.  When the alleged improper conduct was objected to below, prejudice is shown if there is a substantial likelihood that the prosecutor's misconduct affected the jury verdict.  *Id.*  We look at the challenged statements "in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury."  *State v. Warren*, 165 Wn.2d 17, 28, 195 P.3d 940 (2008), *cert. denied*, 556 U.S. 1192 (2009).

Here, Zapel argues that the prosecuting attorney made improper arguments by misstating the law on premeditation.  He contends that the prosecuting attorney "argued that intent to kill proves premeditation."  Br. of Appellant at 39.

A misstatement of the law by the prosecuting attorney constitutes improper argument. *State v. Allen*, 182 Wn.2d 364, 373, 341 P.3d 268 (2015).  The prosecution's statements to the jury

must be confined to the law as stated in the instructions given by the trial court. *State v. Estill*, 80 Wn.2d 196, 199, 492 P.2d 1037 (1972).

Zapel challenges the three arguments made by the State that he objected to below. During closing arguments, the State argued:

> Now, what is our evidence of premeditation? He grabs a knife, more than a moment in point of time, runs back outside. Again, more than a moment in a point of time. Stabs [West] and [Olsen] over and over and over again. Again, more than a moment in point of time. As he's killing [Olsen], he pauses and then stabs, then pauses again and then stabs.

5 VRP (March 17, 2020) at 1890. Next, the State argued:

> Your role is to determine whether the State has proved the elements of the crimes before you beyond a reasonable doubt, those to-convict instructions that the judge gave you. Those are the elements that you are to consider, having to prove intent and premeditated intent.
> And you heard that someone who is insane, who is delusional, can still act with intent. And the evidence shows you that the defendant did act with intent and that that intent was clearly premeditated.

5 VRP (March 17, 2020) at 1892-93. And during rebuttal, the State argued:

> And you'll note from your jury instructions that it's a premeditated intent, so it goes to the intent and whether that intent was premeditated.

5 VRP (March 17, 2020) at 1946.

Zapel contends that the State's arguments, particularly the last argument in rebuttal, "serve to blur the difference between the two legal principles." Br. of Appellant at 43. Zapel asserts that "[s]pecific intent to kill and premeditation are not synonymous, but separate and distinct elements of the crime of first-degree murder." Br. of Appellant at 43 (quoting *State v. Ollens*, 107 Wn.2d 848, 850, 733 P.2d 984 (1987)). Zapel offers no further analysis except to later state, when contending that the comments served to prejudice him, that the prosecuting attorney "implied that

the element of intent was entwined or interchangeable with the much more subtle element of premeditation." Br. of Appellant at 44.

With regard to the first statement that Zapel challenges, in discussing the evidence on premeditation, the prosecuting attorney drew the jury's attention to the manner in which Zapel killed West and Olsen with stabbings "over and over and over again." 5 VRP (March 17, 2020) at 1890. The prosecuting attorney argued that as Zapel killed Olsen, "he pauses and then stabs, then pauses again and then stabs." 5 VRP (March 17, 2020) at 1890. In the challenged statement the prosecuting attorney emphasized the amount of time taken to effectuate the killing. The "method of killing" can provide evidence of premeditation. *Pirtle*, 127 Wn.2d at 644. Thus, these statements are not improper.

With regard to the second challenged statement, the prosecuting attorney told the jury that they must look at the "to-convict" instructions given by the judge, stating, "Those are the elements that you are to consider, having to prove intent and premeditated intent." 5 VRP (March 17, 2020) at 1892. The State then said, "And the evidence shows you that the defendant did act with intent and that that intent was clearly premeditated." 5 VRP (March 17, 2020) at 1893. Although the State failed to distinguish intent and premeditation in these precise comments, the prosecuting attorney also informed the jury that they must look to the elements of the instructions given by the court. Further, the reference to premeditated intent was taken directly from the jury instruction on first degree murder. In context, there was no danger of the jury misunderstanding that intent and premeditation are distinguishable. Zapel fails to show that these statements are improper.

With regard to the third comment, Zapel argues that the prosecuting attorney blurred the difference between intent and premeditated intent and that the State argued that a premeditated intent was required to find Zapel guilty of first degree murder. Again, this statement was taken from the jury instruction on first degree murder. And the prosecuting attorney told the jury that it was taken from the jury instructions. This statement also is not improper.

The challenged statements made by the prosecuting attorney were not improper. Therefore, Zapel's prosecutorial misconduct challenge fails.

CONCLUSION

The trial court did not abuse its discretion in ruling that Zapel was competent to stand trial, there was sufficient evidence of premeditation to support the convictions for first degree murder as charged in Counts I and II, there was insufficient evidence to support the conviction for attempted first degree murder, and the prosecuting attorney did not commit misconduct during closing arguments. Therefore, we affirm Zapel's convictions for first degree murder as charged in Counts 1 and II, reverse Zapel's conviction for attempted first degree murder, and remand to the trial court for entry of the lesser included offense of attempted second degree murder and for resentencing.

No. 55098-9-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, P.J.

Price, J.