IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83138-1-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| MARVIN J. TALAVERA-HERNANDEZ, | |
| Appellant. | |

CHUNG, J. — The State charged Marvin Talavera-Hernandez with child rape and molestation for acts of sexual abuse involving his stepdaughter. His first trial ended in a mistrial. His second trial, at which he represented himself, ended with convictions on all counts. Talavera[1] claims several errors by the trial court: improperly declaring a mistrial; allowing him to represent himself without a valid waiver; failing to order a competency evaluation; and allowing a State expert witness to render an opinion on his guilt.

We conclude that Talavera consented to his mistrial, so the State did not violate double jeopardy. Further, the trial court properly conducted its colloquy and determined his waiver of his right to counsel was voluntary, intelligent, and knowing. The trial court did not abuse its discretion by not ordering a competency examination on its own accord. Finally, the claimed evidentiary error is not a

---

[1] Appellant's briefing uses the name Talavera, so we use that name here.

manifest constitutional error, so Talavera cannot raise it for the first time on appeal. Therefore, we affirm.

FACTS

In 2018, the State charged Talavera with one count of second degree rape of a child and one count of first degree child molestation. In January 2019, the State amended the information to three counts of first degree rape of a child and first degree child molestation, all for acts toward his stepdaughter, J.J.

Talavera's first, week-long trial began in May 2019. Talavera was represented by counsel and had a court-certified interpreter. At the end of the trial, the jury retired to deliberate at 11:19 a.m. They received the exhibits and ate lunch and then began deliberations at approximately 11:45 a.m. At 2:19, the jury sent a question to the court asking, "What do we do if we have [sic] do not have a consensus."

Without the jury present, the court discussed with the parties its plan to poll the jurors. The court proceeded to poll every juror, asking "is there a reasonable probability of the jury reaching a verdict within a reasonable time as to all of the counts?" Every juror answered "no." The court then asked each juror, "Is there a reasonable probability of the jury reaching a verdict within a reasonable time as to any of the counts?" Each juror again answered "no." [2]

---

[2] The pattern instruction includes both questions as possibilities. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: General Instruction 4.70 at 157 (5th ed. 2021). The accompanying "Note on Use" explains, "Use bracketed material as applicable to find out whether the jury may have a verdict or be able to reach a verdict on some of the counts . . . and possibly be deadlocked on the others."

Out of the presence of the jury, the court then told the parties that it intended to declare a mistrial and asked for their responses. Both the State and Talavera agreed with the court's plan. The court dismissed the jury and entered its written order declaring a deadlocked jury. The court's order indicated that the defendant "has consented to the discharge of the jury."

Before his second trial, the court granted Talavera's motion to proceed pro se. Standby counsel was appointed, but Talavera chose to proceed to trial despite standby counsel's unavailability. COVID-19 disrupted the trial court's calendar, but during renewed preparations for his second trial, at Talavera's request, the court dismissed standby counsel. At his second trial, Talavera did not question potential jurors, and he conducted minimal cross-examination of witnesses. His closing argument was extremely short. The jury found him guilty on all counts. After the court appointed appellate counsel, Talavera timely appealed.

## DISCUSSION

On appeal, Talavera claims several errors by the trial court: improperly declaring a mistrial so as to place him in double jeopardy; violating his right to counsel by allowing him to represent himself without valid waiver; violating due process and RCW 10.77.050 by not ordering a competency evaluation; violating due process and his right to counsel by not determining whether he was competent to represent himself; and allowing a State expert witness to render an opinion on his guilt.

I.     Double Jeopardy

Talavera argues the State subjected him to double jeopardy because no extraordinary and striking circumstances warranted the trial court's declaration of a mistrial. The State argues jeopardy did not terminate because Talavera consented to the mistrial. We agree with the State.

The Fifth Amendment to the United States Constitution and article I, section 9 of the Washington State Constitution are "identical in thought, substance, and purpose," and both prohibit a State from twice putting a person in jeopardy for the same offense. State v. Ervin, 158 Wn.2d 746, 752, 147 P.3d 567 (2006). Double jeopardy not only protects criminal defendants from a second prosecution for the same offense after a conviction or an acquittal and from multiple punishments for the same offense, but it also protects criminal defendants' right to a trial completed by the original jury. State v. Jones, 97 Wn.2d 159, 162, 641 P.2d 708 (1982).

Double jeopardy applies when (1) jeopardy has previously attached, (2) jeopardy has terminated, and (3) the State places a defendant in jeopardy a second time for the same offense in fact and law. Ervin, 158 Wn.2d at 752. Jeopardy attaches once the jury is impaneled and the first witness answers the first question. Jones, 97 Wn.2d at 162. Jeopardy terminates when a criminal defendant (1) is acquitted, (2) is convicted and that conviction is final, or (3) the court dismisses the jury without the defendant's consent and the dismissal is not in the interest of justice. Ervin, 158 Wn.2d at 752-53 (citing Green v. United

4

<u>States</u>, 355 U.S. 184, 188, 78 S. Ct. 221, 2 L. Ed. 2d 199 (1957)). In this case, the parties dispute only whether jeopardy terminated.

Talavera's first trial ended in a mistrial. Double jeopardy protects a criminal defendant not only after acquittal or conviction, but also after the trial is terminated by mistrial. <u>Jones</u>, 97 Wn.2d at 162. However, double jeopardy's protection against retrials following a mistrial is not absolute. <u>Id</u>. In particular, a hung jury is an unforeseeable circumstance that requires dismissing the jury in the interests of justice. <u>Ervin</u>, 158 Wn.2d at 753. Thus, jeopardy does not terminate if either a defendant consents to a mistrial or a trial court declares a mistrial in the interest of justice. <u>State v. Juarez</u>, 115 Wn. App. 881, 888, 64 P.3d 83 (2003) ("If the defense did not freely consent [to a mistrial], [then] we examine the sufficiency of the trial court's grounds for discharging the jury.").

An appellant can raise double jeopardy for the first time on appeal. <u>State v. Jackman</u>, 156 Wn.2d 736, 746, 132 P.3d 136 (2006); RAP 2.5(a). Double jeopardy is a question of law reviewed de novo. <u>State v. Strine</u>, 176 Wn.2d 742, 751, 293 P.3d 1177 (2013). However, the decision whether to grant a mistrial is reserved to the "broad discretion" of the trial judge, especially in cases involving a potentially deadlocked jury. <u>Strine</u>, 176 Wn.2d at 754 (citing <u>Arizona v. Washington</u>, 434 U.S. 497, 509-10, 98 S. Ct. 824, 54 L.Ed.2d 717 (1978)).

Here, the parties do not dispute that jeopardy attached and that the State retried Talavera, so the issue is whether jeopardy terminated after his first trial. Jeopardy did not terminate if Talavera consented to the mistrial. The record shows Talavera agreed with the trial court's plan to poll the jurors and in fact

argued for the court to poll the jurors. After polling the jurors, the trial court stated, "my inclination would be to declare a mistrial," and asked for the parties' responses. The prosecutor said "I don't think there's anything I can say, Your Honor, and I don't think there's any instructions that the Court can give." Talavera's counsel said, "Agreed." And the court's order declaring deadlock indicated Talavera "has . . . consented to the discharge of the jury." Thus, jeopardy did not terminate because Talavera consented to the discharge of the jury.

Talavera argues his consent "was really no consent at all" because he had only a "Hobson's choice"[3] between allowing the jury to continue its deliberations or agreeing to poll the jurors. However, the authority he cites, State v. Rich, is distinguishable. 63 Wn. App. 743, 821 P.2d 1269 (1992). In Rich, the defendant did not appear the morning of trial, and the court recessed the trial to give him time to appear. Id. at 745. After an hour's recess, the court granted the State's motion to try the defendant *in absentia*. Id. After both parties presented witnesses and rested their cases, the defendant appeared and moved to dismiss for insufficient evidence, as none of the witnesses had identified him as the person arrested for the crime charged. Id. at 746. The court denied the motion and gave the defendant a choice: either agree to allow the State to reopen its case or agree to a mistrial. Id. Even though the defendant objected to both choices, the court granted its own motion for a mistrial. Id. The reviewing court held that the

---

[3] An apparent freedom to take or reject something offered when in actual fact no such freedom exists: an apparent freedom of choice where there is no real alternative. Webster's New International Dictionary 1076 (3rd ed. 1969).

defendant had not consented, as he had been "faced with a Hobson's choice" between agreeing to allow the State to reopen its case, "which would clearly prejudice his prospects for acquittal," or a mistrial, and chose neither. Id. at 748. "His failure to select either of two unfavorable options cannot be considered consent to the declaration of a mistrial." Id. at 748.

Here, unlike the defendant in Rich, Talavera was not presented with two unfavorable options, but rather, requested the court to poll the jury. Then, when the court suggested a mistrial, he affirmatively consented to the jury's discharge. Therefore, jeopardy did not terminate and the State did not twice place Talavera in jeopardy.[4]

## II.    Right to Counsel

Talavera contends the trial court violated his constitutional right to counsel, and his conviction should be reversed, because he did not knowingly, intelligently, and voluntarily waive this right. The State argues the trial court did not abuse its discretion in granting Talavera's motion to proceed pro se. We agree with the State.

"Criminal defendants have an explicit right to self-representation under the Washington Constitution and an implicit right under the Sixth Amendment to the United States Constitution." State v. Madsen, 168 Wn.2d 496, 503, 229 P.3d 714 (2010) (citing WASH. CONST. art. I, § 22; Faretta v. California, 422 U.S. 806,

---

[4] Talavera's consent is dispositive of the issue of termination and double jeopardy. Talavera argues that the jury's two hours of deliberation is "inadequate." However, the Washington Supreme Court expressly declines to require the "mechanical application" or any "rigid formula" when trial judges decide whether jury deadlock warrants a mistrial. Strine, 176 Wn.2d at 755 (citing Wade v. Hunter, 336 U.S. 684, 691, 69 S. Ct. 834, 93 L. Ed. 974 1978)).

819, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)). The right to self-representation is "so fundamental that it is afforded despite its potentially detrimental impact on both the defendant and the administration of justice." Madsen, 168 Wn.2d at 503.

Criminal defendants also have a right to counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. "A tension exists between the constitutional right to self-representation and the constitutional right to proceed with adequate counsel." State v. Burns, 193 Wn.2d 190, 202, 438 P.3d 1183 (2019). Defendants have a right to waive assistance of counsel and represent themselves at trial. State v. DeWeese, 117 Wn.2d 369, 375, 816 P.2d 1 (1991). Given the hazards of self-representation, courts are required to give "every reasonable presumption" against a defendant's waiver of right to counsel. Madsen, 168 Wn.2d at 504.

As a result of this presumption, a trial court may deny a request for self-representation only if the request is equivocal, untimely, involuntary, or made without a general understanding of the consequences. Burns, 193 Wn.2d at 202-03; Madsen, 168 Wn.2d at 504-05. "[T]he record will establish that '[the defendant] knows what [they are] doing and [the] choice is made with eyes open.' " State v. Hahn, 106 Wn.2d 885, 889, 726 P.2d 25 (1986) (quoting Faretta, 422 U.S. at 835). Courts engage in a multistep process to evaluate a defendant's request to proceed pro se, first determining whether the request was unequivocal and timely, then proceeding to determine if the request is knowing, voluntary and intelligent. Burns, 193 Wn.2d at 203.

To assess the defendant's understanding of the risks of forgoing counsel, courts engage in a colloquy which "should generally include a discussion of the nature of the charges against the defendant, the maximum penalty, and the fact that the defendant will be subject to the technical and procedural rules of the court in the presentation of his case." Burns, 193 Wn.2d at 203. Courts may also consider education, experience with the justice system, mental health, and competency, as well as the defendant's behavior, intonation, and willingness to cooperate with the court. Id. The court then uses all the information gained from the colloquy to ensure the defendant's waiver of counsel is made with an understanding of the seriousness and possible consequences. Id. at 203-04. Waiving one's constitutional right to counsel requires a heightened standard in that waiver must be knowing and voluntary, but no heightened standard of competence is required. Burns, 193 Wn.2d at 206 (citing Godinez v. Moran, 509 U.S. 389, 400, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993)). We consider only the evidence before the trial court at the time of the colloquy; subsequent conduct while a defendant is proceeding pro se is not part of our inquiry. State v. Sabon, __ Wn. App. 2d __, 519 P.3d 600, 607 (Wash. Ct. App. 2022).

We review a trial court's decision on a defendant's request to proceed pro se for abuse of discretion. Burns, 193 Wn.2d at 202. A trial court abuses its discretion if its decision is manifestly unreasonable, unsupported by the record, or based on an incorrect legal standard. Id. We give deference to the trial court's discretion because "[t]rial judges have more experience with evaluating requests to proceed pro se and have the benefit of observing the behavior, intonation, and

characteristics of the defendant during a request." Id. The defendant has the burden to prove improper waiver. Hahn, 106 Wn.2d at 885.

Here, Talavera argues the trial court failed to establish on the record through a sufficiently "penetrating and comprehensive" colloquy that he had sufficient understanding of the charges against him and the disadvantages of representing himself. The record demonstrates otherwise. Two judges conducted extensive colloquies to verify Talavera's request for self-representation. Both concluded that his waiver was knowing, intelligent, and voluntary.

Talavera initially moved to proceed pro se approximately one month before his case was set for retrial. The court addressed the seriousness of the charges and the hazards of representing himself. The court began, "first of all, I do want to impress on you, you do understand the seriousness of the charges that you're facing?" The court explained to Talavera that he faced some of the most serious charges a person could face, including three counts of rape of a child in the first degree that each carried a potential life sentence. The court informed Talavera that proceeding pro se "seems highly ill advised."

Talavera affirmed that he understood the charges. He told the court, "she cannot even prove everything she's saying. . . And I can prove what I'm going to say." When asked about whether he had a legal background, Talavera responded, "I don't have any law background, and I'm not going to have it . . . But I still want to represent myself."

The court asked Talavera if he understood he would need to follow procedures and rules, even though he did not know the rules. Talavera

10

acknowledged this but reiterated that he wanted to represent himself. The court reminded Talavera that an attorney "apparently must have persuaded some of the jurors [in the previous trial] that the State had not proven you guilty beyond a reasonable doubt," and so an attorney could also help in the second trial. Talavera said, "Yeah, I understand that," but continued to assert his desire to proceed pro se.

After the repeated assertions, the court attempted to dissuade Talavera again, stating "I'm going to say this much. You have a right to represent yourself. Given the nature of the charges that you are facing, given the consequences, if you are found guilty of even one of them, I think that it is not a wise decision to proceed without an attorney." Talavera responded that he understood.

The court tried one last time:

> Well, Mr. Talavera-Hernandez, if it is your decision, in light of all of the consequences, to represent yourself, despite your lack of legal knowledge or anything about legal procedure -- and you understand the state's going to be represented by an attorney who has all of that knowledge, and you still want to represent yourself?

Talavera responded, "Yeah, it's good to have even more advantages." When the trial court attempted to clarify this response, Talavera said, "for her to have advantages, that's okay." The court tried to again to understand Talavera's response:

> I'm not sure what you mean exactly by that. I'm just trying to make sure you understand what a serious decision you're making. I mean, there may be times when an attorney would make an objection as to the testimony, and you're not going to know when to do that.

Talavera said he was "just going to use what they have said already."

11

In the end, and with reluctance, the trial court found that Talavera made a knowing and voluntary waiver of his right to counsel and it had no choice but to permit self-representation. The court concluded by offering stand-by counsel, which Talavera reluctantly accepted.

Trial was delayed due to COVID-19, and when the time for trial approached in August 2021, stand-by counsel was unavailable. Talavera told the court[5] he did not want any assistance with his case. Talavera said, "I don't trust anyone. I can do it." The court verified,

> At this point, it does seem—and I am basing this both on the oral statements of Mr. Talavera as well as, frankly, his clear demeanor in answering the questions and in how he is representing himself to the Court that he does not wish to have an attorney assist him or be available to him to assist in any way. And, again, Mr. Talavera, I just want to make sure that I am understanding all of this correctly. Do I have that correct?

Talavera responded, "It is correct." The court then concluded that "Mr. Talavera absolutely unequivocally has indicated—which is his right—that he wishes to represent himself and not have standby counsel." Additionally, the court found, "He is making this decision clearly, knowingly, voluntarily, and intelligently. This is based on this colloquy here today as well as several previous conversations Mr. Talavera has had with this Court and [a different judge]. And I am incorporating all of those previous hearings by reference."

When the time for trial arrived, the court had another conversation with Talavera at the behest of the State. "Mr. Talavera Hernandez, we've discussed this several times. Are you really sure about this decision? It seems you're not in

---

[5] At this point, the case proceeded before a different judge from the earlier proceedings.

a place to really effectively meet what's against you." Talavera responded, "I'm not worried about what they say. What I'm worried about is that I'm not taken advantage of."

Unsatisfied with that answer, the court reiterated its concern that Talavera was unprepared and asked, "You have told it's [sic] at least three judges that you don't want an attorney and it's your decision. But again, is this I guess really what you want to do?" Talavera replied, "As I said before, I already won this case and I know what I am going to do. They, themselves accused themselves and I'm ready."

The court made a final attempt to dissuade Talavera: "I guess I'm just going to say it one last time, maybe in a different way. I don't think you're making a great decision. The optics, as I say, just don't look good, but it is your decision to make." Talavera told the court, "I am innocent and I have nothing to fear." After that, the court began hearing motions in limine.

Two separate judges conducted colloquies to assess Talavera's waiver of counsel and his request to proceed pro se. In both instances, the court explained the nature and seriousness of the charges and that Talavera would be at a disadvantage because he did not know the legal rules and procedures. Talavera confirmed his understanding and remained firm in his request to represent himself. Even on the eve of trial when the court observed that Talavera appeared unprepared, Talavera said "I'm prepared." He also told the court, "When I am ready, I will represent myself," and "I already won this case and I know what I'm

going to do." He indicated that he would follow the blueprint from the previous case, as he was "just going to use what they said already."

In addition to Talavera's repeated acknowledgments that he was aware and understood the seriousness of the charges and was prepared to represent himself, Talavera had first-hand knowledge of the process from the first trial on the charges, during which he was represented by counsel. Courts have considered this experience in assessing a defendant's request for self-representation. "The knowledge required to waive counsel may be gained from participation in an earlier trial on the same matter." State v. Conlin, 49 Wn. App. 593, 595–96, 744 P.2d 1094 (1987). As the court described in another case, when the defendant had already experienced a previous trial, the defendant

> witnessed firsthand a full, totally realistic demonstration and application of what to expect, what the problems of presenting his defense were and precisely how to do it. The trial gave him a sound basis from which to make a judgment as to self-representation, far better than verbal advice from the bench, no matter how well conceived and delivered.

State v. Strodtbeck, 46 Wn. App. 26, 29, 728 P.2d 622 (1986). The same holds true for Talavera.

Given Talavera's participation in his prior trial and his steadfast commitment to proceeding pro se expressed through at least two complete colloquies detailing the serious nature of child rape charges, the potential for a life sentence, and the technical nature of particularly the evidentiary law and trial procedure for which he would be responsible as pro se, the trial court did not

abuse its discretion by finding that Talavera had knowingly, intelligently, and voluntarily waived his right to counsel.[6]

    III.    <u>Competency to Proceed Pro Se</u>

Talavera next contends the trial court violated due process and his right to counsel by not determining whether he was competent to represent himself pro se. We disagree, as the law does not require an evaluation of competency for a valid waiver of the right to counsel to proceed pro se.

"Although often conflated under an umbrella of 'competency,' the distinction between competency to stand trial [i.e., as a defendant] and competency to represent oneself [i.e., as pro se counsel] is important, as the legal standards governing each are vastly different." <u>State v. Phan</u>, No. 82708-1, slip op. at 15, (Wash. Ct. App. Dec. 27, 2022), https://www.courts.wa.gov/opinions/pdf/827081.pdf. The Washington Supreme Court has held that a trial court is *permitted* "to consider the defendant's mental health when assessing whether a request for self-representation is knowing, intelligent, and voluntary, but that the trial court is *not constitutionally required* to conduct an independent determination as to the defendant's competency to proceed pro se." <u>Phan</u>, No. 82708-1, slip op. at 18 (original emphasis) (citing <u>In re Pers. Restraint of Rhome</u>, 172 Wn.2d 654, 665, 260 P.3d 874 (2011)).

"[A] defendant's mental health status is but one factor a trial court may consider in determining whether a defendant has knowingly and intelligently

---

[6] While the thrust of Talavera's argument is that his waiver was not knowing or intelligent, he suggests his performance as counsel should be reviewed. However, a pro se litigant's subsequent performance as pro se counsel is not part of the inquiry into whether waiver was knowing and intelligent. <u>Sabon</u>, 519 P.3d at 607.

waived his right to counsel, but [precedent does] not require us to find that an independent determination of competency for self-representation is a constitutional mandate." In re Rhome, 172 Wn.2d at 665; Phan, No. 82708-1, slip op. at 20 (explaining that " '[m]andating the use of that discretionary authority [to order a competency examination] in some difficult-to-define subset of these types of cases will only limit trial court discretion at a time when it is most needed and will not provide for any meaningful review' ") (quoting State v. Lawrence, 166 Wn. App. 378, 395, 271 P.3d 280 (2012)). However, if incompetency is a basis for finding that a pro se request was not made voluntarily, knowingly, and intelligently, the trial court is required to order a competency evaluation if the colloquy leads to such concerns. Sabon, 519 P.3d at 608 (citing State v. Madsen, 168 Wn.2d 496, 510, 229 P.3d 714 (2010)).

As analyzed in the preceding section, Talavera's waiver of his right to counsel was knowing, voluntary, and intelligent. The trial court's decision not to sua sponte order a competency evaluation of Talavera to proceed as pro se counsel was not an abuse of its discretion.

IV. Competency to Stand Trial

Talavera also contends the trial court violated his due process rights and RCW 10.77.050 by failing to order a competency evaluation for him as a defendant. We disagree.

The due process clause of the Fourteenth Amendment to the United States Constitution prohibits criminal prosecution of a legally incompetent defendant. State v. McCarthy, 193 Wn.2d 792, 800, 446 P.3d 167 (2019).

16

Washington provides protection under RCW 10.77.050: "[n]o incompetent person shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity continues." Incompetency "means a person lacks the capacity to understand the nature of the proceedings against him or her or to assist in his or her own defense as a result of mental disease or defect." RCW 10.77.010(17). Washington has a two-part test for legal competency: (1) whether the defendant understands the nature of the charges and (2) whether he is capable of assisting in his defense. In re Fleming, 142 Wn.2d 853, 862, 16 P.3d 610 (2001). RCW 10.77.060(1)(a) establishes the trial court's role in ensuring legally competency for prosecution:

> Whenever . . . there is reason to doubt his or her competency, the court on its own motion or on the motion of any party shall either appoint or request the secretary to designate a qualified expert or professional person, who shall be approved by the prosecuting attorney, to evaluate and report upon the mental condition of the defendant.

In deciding whether a competency hearing is necessary, the trial court considers defendant's behavior, demeanor, appearance, personal and family history, psychiatric reports, and defense counsel's opinion. McCarthy, 193 Wn.2d at 801. We review whether a trial court should have sua sponte ordered a competency evaluation for abuse of discretion. Id. at 803.

Here, Talavera asserts there were "numerous reasons" to doubt his competency. He dismissed his attorney and refused stand-by counsel, made statements about God's will, said he "already won this case" and that he did not trust anyone. He also refused to open the 278 pages of discovery from his first trial provided to him by the State, saying "It's not important to me," and he failed

17

to attend a mutually scheduled discovery conference with the State. Throughout the trial he made religious references and sometimes incomprehensible assertions.[7]

However, Talavera also demonstrated his competence by engaging in strategic decisions and actions, such as conducting cross-examination with a clearly articulated purpose. For example, the court questioned Talavera as to the relevance of his line of questioning of J.J.'s father about a police report on vandalism of J.J.'s father's car. Talavera explained "[i]t's going to, like, impeach the police report." When asked how, Talavera said "[p]roving that they lie. The prosecution is making an accusation based on a police report and, beyond that, [J.J.'s mother] and [J.J.]. So what I'm trying to get at is for the police report not to be considered." While the evidence appeared irrelevant to the State and the court, Talavera was enacting a strategy to further his defense.

During cross-examination of J.J., Talavera elicited information that J.J. had an allergic reaction to latex resulting in hives. The State discussed the presence of latex in condoms, and J.J. denied having broken out in hives after Talavera had sex with her. Talavera reminded the jury of the allergy during closing arguments. "At no moment did she mention that she had to be taken to a hospital or that she had to take medicine somehow, so she couldn't have been touched without having that kind of reaction." Talavera was clearly drawing the

---

[7] For example, when explaining his lack of participation in voir dire, Talavera explained, "For me, they are not the ones that decide. So then I don't care if they're there or not." When the trial court asked who Talavera believed would decide, he replied "God." In closing arguments, Talavera told the jury, "So I'm not a promoter of stars. I'm not promoting people to be famous. For that, look for -- I hope you declare me not guilty because I have a lot of work to do. That's it. I'm very thankful to you."

18

connection between the use of latex condoms and J.J.'s allergy in an attempt to refute her claims.

While Talavera declined to participate in certain parts of the proceedings and made odd statements throughout the trial, he demonstrated a strategy to defend himself and attempts to implement that strategy. Thus, Talavera displayed behavior that satisfied Washington's standard for determining a defendant is competent to stand trial: he understood the charges against him and assisted in his defense. See Fleming, 142 Wn.2d at 862.

V.      Opinion on Guilt

Finally, Talavera argues that an expert witness rendered "an almost explicit opinion" on his guilt. Because there is no manifest constitutional error, we decline to review the merits on appeal.

One of the testifying witnesses was a licensed mental health counselor with a child advocacy program. She conducted a mental health assessment of J.J. that resulted in a referral for ongoing therapy. During the assessment, the counselor used several screening tools to evaluate J.J.'s mental health. The State asked the counselor about her findings:

> PROSECUTOR: Okay. And what were the results of that, if you recall?
>
> WITNESS: She had clinically significant trauma symptoms.
>
> PROSECUTOR: What does that mean?
>
> WITNESS: That the symptoms that she was reporting connected to this traumatic event were sufficient to meet criteria for a mental health diagnosis and necessitate ongoing therapy.

Talavera did not object to this testimony. On appeal, Talavera challenges this testimony as an improper opinion on his guilt that violated his right to a jury trial. Under RAP 2.5(a), the appellate court may refuse to review an error not raised before the trial court. "Appellate courts will not approve a party's failure to object at trial that could identify error which the trial court might correct (through striking the testimony and/or curative jury instruction)." State v. Kirkman, 159 Wn.2d 918, 935, 155 P.3d 125 (2007). However, a party may raise a manifest error affecting a constitutional right for the first time on appeal. RAP 2.5(a)(3). "The defendant must demonstrate that '(1) the error is manifest, and (2) the error is truly of constitutional dimension.' " State v. Dillon, 12 Wn. App. 2d 133, 139-40, 456 P.3d 1199 (quoting State v. O'Hara, 167 Wn.2d 91,98, 217 P.3d 756 (2009)), review denied, 195 Wn.2d 1022, 464 P.3d 198 (2020). This standard requires the defendant to identify a constitutional error and show how the error actually affected their rights at trial. Kirkman, 159 Wn.2d at 926-27. The appellant must make a plausible showing that the asserted error had practical and identifiable consequences in the trial. State v. A.M., 194 Wn.2d 33, 38, 448 P.3d 35 (2019).

"The right to have factual questions decided by the jury is crucial to the right to trial by jury." State v. Montgomery, 163 Wn.2d 577, 590, 183 P.3d 267 (2008). "The general rule is that no witness, lay or expert, may 'testify to his opinion as to the guilt of a defendant, whether by direct statement or inference.' " City of Seattle v. Heatley, 70 Wn. App. 573, 577, 854 P.2d 658 (1993) (quoting State v. Black, 109 Wn.2d 336, 348, 745 P.2d 12 (1987)). When determining whether statements are an impermissible opinion on guilt, courts consider the

circumstances of the case, including the type of witness involved, the specific nature of the testimony, the nature of the charges, the type of defense, and the other evidence before the trier of fact. Heatley, 70 Wn. App. at 579. Expressions of personal belief as to the guilt of defendant, intent of the accused, or veracity of witnesses are improper opinion testimony. Montgomery, 163 Wn.2d at 591.

Despite the clear prohibition of opinion testimony on credibility, "[a]dmission of witness opinion testimony on an ultimate fact, without objection, is not automatically reviewable as a 'manifest' constitutional error." Kirkman, 159 Wn.2d at 936. In such cases, manifest error requires "an explicit or almost explicit witness statement." Kirkman, 159 Wn.2d at 936. Opinion testimony relating only indirectly to a victim's credibility does not rise to the level of manifest constitutional error. Kirkman, 159 Wn.2d at 922.

Talavera objects to the mental health counselor's statement: "the symptoms that [J.J.] was reporting connected to this traumatic event were sufficient to meet criteria for a mental health diagnosis and necessitate ongoing therapy." Specifically, Talavera points to the counselor's reference to "this traumatic event" as testimony that "linked, without any scientific basis, the symptoms that J.J. was suffering to the alleged abuse," and was, therefore, an unconstitutional comment on guilt. Talavera cites to State v. Black, 109 Wn.2d 336, 745 P.2d 12 (1987), and State v. Hudson, 150 Wn. App. 646, 208 P.3d 1236 (2009), to support his claim that this medical expert testimony constituted improper opinion on his guilt.

21

In Black, the court concluded that an expert's testimony on rape trauma syndrome was an opinion on the defendant's guilt: "[i]t carries with it an implied opinion that the alleged victim is telling the truth and was, in fact, raped. It constitutes, in essence, a statement that the defendant is guilty of the crime of rape." 109 Wn.2d at 349. Following the example of Black, Hudson discussed an expert's testimony that the nature of the alleged victim's injuries were "extensive injury related to nonconsensual sex," and determined that the expert "explicitly testified" that the alleged victim's injuries "were caused by nonconsensual sex, i.e., rape," and because the alleged victim "had no sexual encounters other than with Hudson, who did not dispute that their encounter caused her injuries, these opinions amounted to statements that he was guilty of rape." 150 Wn. App. at 653 (original emphasis).

Despite both cases involving expert opinions provided after evaluations of alleged sexual assault victims, Hudson and Black have important distinctions that make them inapposite to the case at hand. Both cases considered errors properly preserved at the trial court. The court in Black expressly determined the appellant had preserved the issue for appeal. 109 Wn.2d at 340. And in Hudson, the defendant objected to the testimony during trial. 150 Wn. App. at 651. As a result, neither of these cases necessitated a showing of manifest constitutional error—and the required explicit or almost explicit statement of opinion on guilt— in order to be properly considered on appeal. The reviewing courts examined the merits without the initial hurdle of manifest constitutional error. In the case of Black, this distinction proves critical. The court noted that the witness statement

was "an implied opinion that the alleged victim is telling the truth." Black, 109 Wn.2d at 349. An implied opinion would not have met the standard for manifest constitutional error.

Here, Talavera acknowledges the implicit nature of the mental health counselor's statement. He contends that because the only sexual interactions the jury heard about were allegedly between himself and J.J., the mental health counselor's testimony "carried an implied opinion that J.J. was telling the truth" and that he had raped her. But an implied opinion will not satisfy the requirement for an explicit or near explicit statement for review as a manifest constitutional error.

This court has declined to review similar unpreserved errors. For example, in State v. Borsheim, 140 Wn. App. 357, 362-63, 165 P.3d 417 (2007), 11-year-old B.G. alleged that her mother's partner sexually abused her. A medical witness testified that she had reviewed B.G.'s medical files, her observations were consistent with B.G.'s reports of sexual abuse, and her medical diagnosis was that B.G. had been sexually abused. Borsheim, 140 Wn. App. at 363. This testimony did not rise to the level of manifest constitutional error because it "conveyed only the witness's opinion that sexual abuse had occurred, not that the witness believed B.G.'s assertion that Borsheim was the party guilty of that abuse." Borsheim, 140 Wn. App. at 375.

Compared to Borsheim, the testimony in this case was much less direct on the subject of sexual abuse. Rather than testify about sexual abuse, the expert merely concluded that J.J.'s mental health issues connected to "this

traumatic event" showed a need for continuing treatment. Reference to "this traumatic event" was not an explicit or near explicit opinion on Talavera's guilt. Therefore, Talavera has not demonstrated a manifest constitutional error, and we decline to review the merits of this issue on appeal.

Affirmed.

_Chung, J._

WE CONCUR:

_Birk, J._     _Dwyer, J._